# Supreme Court of Florida

————————

No. SC16-218

————————

**R.J. REYNOLDS TOBACCO COMPANY,**
Petitioner,

vs.

**PHIL J. MAROTTA, etc.,**
Respondent.

[April 6, 2017]

LABARGA, C.J.

This case is before the Court for review of the decision of the Fourth District

Court of Appeal in R.J. Reynolds Tobacco Co. v. Marotta, 182 So. 3d 829 (Fla. 4th

DCA 2016).  In its decision, the district court ruled upon the following question,

which the court certified to be of great public importance:

> WHETHER FEDERAL LAW IMPLICITLY PREEMPTS STATE
> LAW TORT CLAIMS OF STRICT LIABILITY AND
> NEGLIGENCE BY ENGLE[1] PROGENY PLAINTIFFS BASED ON
> THE SALE OF CIGARETTES.

————————————

1. As will be discussed later in this opinion, "Engle" refers in general to the
class action and the jury findings that apply to the defendants of the class action,
and "Engle progeny" cases refer to the individual causes of action brought by

Id. at 834.  We have jurisdiction.  See art. V, § 3(b)(4), Fla. Const.  Because we

conclude that Engle did not impose liability based solely on the sale of cigarettes,

we rephrase the certified question as follows:

> WHETHER FEDERAL LAW IMPLICITLY PREEMPTS STATE
> LAW TORT CLAIMS OF STRICT LIABILITY AND
> NEGLIGENCE BY ENGLE PROGENY PLAINTIFFS.

We answer the rephrased question in the negative and approve the Fourth

District's decision related to the preemption issue; however, we quash the

decision below to the extent that it held that respondent, as representative of

the estate of Phil Felice Marotta, was precluded from seeking punitive

damages and remand for further proceedings consistent with this opinion.

## BACKGROUND

This case follows a long line of cases decided in light of Engle v. Liggett

Group, Inc. (Engle III), 945 So. 2d 1246 (Fla. 2006).  In Engle, a group of smokers

and their survivors filed a class action against major tobacco companies for

damages allegedly caused by smoking-related injuries.  Id. at 1256.[2]  Among other

---

plaintiffs pursuant to this Court's decision in Engle v. Liggett Group, Inc. (Engle
III), 945 So. 2d 1246 (Fla. 2006).

2.  The Engle defendants included R.J. Reynolds Tobacco Company, Philip
Morris Inc., Lorillard Tobacco Company, Lorillard, Inc., American Tobacco
Company, Brown & Williamson Tobacco Corporation, Liggett Group, Inc., Dosal
Tobacco Corporation, Council for Tobacco Research-U.S.A., Inc., Tobacco

- 2 -

things, the class sought compensatory damages based on various theories, including strict liability and negligence.

After certification of the class in R.J. Reynolds Tobacco Co. v. Engle (Engle I), 672 So. 2d 39 (Fla. 3d DCA 1996), the trial court developed a three-phase trial plan. Phase I consisted of a year-long jury trial to determine issues related to liability and entitlement to punitive damages. Liggett Grp. Inc. v. Engle (Engle II), 853 So. 2d 434, 441 (Fla. 3d DCA 2003). The jury considered issues common to the entire class, including the defendants' conduct, general causation, and the effects of smoking on health. Id. The jury returned a verdict in favor of the class on all counts and determined that the Engle defendants' actions entitled the class to punitive damages. Id.

In Phase II, the same jury decided the individual causation and damages for the class representatives, as well as the amount of punitive damages to be awarded to the entire class. Id. The jury found that the class representatives were entitled to compensatory damages, and awarded class-wide punitive damages in the amount of $145 billion.[3]

_____

Institute, Inc., and Brooke Group, Ltd., Inc. See R.J. Reynolds Tobacco Co. v. Engle, 672 So. 2d 39, 39 (Fla. 3d DCA 1996).

3. This Court later held that the punitive damages award was both clearly excessive and premature because, although the Phase I jury decided the Engle defendants' common liability to the class under certain claims, it did not decide the plaintiff-specific elements of those claims and, therefore, "did not determine

- 3 -

The plan for Phase III was to have different juries decide the individual causation and damages for each class member, but prior to the start of Phase III, the class was decertified "because individualized issues such as legal causation, comparative fault, and damages predominate[d]." Engle III, 945 So. 2d at 1268. This Court held that individual class members could initiate individual actions against the Engle defendants "within one year of the issuance of [Engle III] with res judicata effect given to certain Phase I findings." Id. at 1254.

Specifically, this Court held that the following Phase I findings were entitled to res judicata effect: (1) smoking cigarettes causes certain enumerated diseases, including lung cancer; (2) nicotine is addictive; (3) the Engle "defendants placed cigarettes on the market that were defective and unreasonably dangerous"; (4) the Engle defendants "concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both"; (5) the Engle "defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment"; (6) "all of the [Engle] defendants sold or supplied cigarettes that were

whether the defendants were liable to anyone." Engle III, 945 So. 2d at 1263 (quoting Engle II, 853 So. 2d at 450).

- 4 -

defective"; (7) "all of the [Engle] defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by said defendants"; and (8) "all of the [Engle] defendants were negligent." Id. at 1276-77. However, this Court disapproved the use of the Phase I findings relating to intentional infliction of emotional distress, fraud and misrepresentation, and civil conspiracy based on misrepresentation because the nonspecific findings were "inadequate to allow a subsequent jury to consider individual questions of reliance and legal cause." Id. at 1255.

After Engle III was issued, there was some confusion among the courts regarding whether the Phase I findings were to be given the effect of claim preclusion or issue preclusion. This Court clarified that the "res judicata" effect in Engle III is claim preclusion, not issue preclusion. Philip Morris USA, Inc. v. Douglas, 110 So. 3d 419, 432 (Fla. 2013).

**FACTS AND PROCEDURAL BACKGROUND**

The representative for the estate of Phil Felice Marotta (Marotta) filed an action as an Engle progeny plaintiff against R.J. Reynolds Tobacco Company (Reynolds), an Engle defendant, asserting that Marotta's addiction to Reynolds' cigarettes caused his death by lung cancer. Marotta raised several claims based on the Engle Phase I findings, including strict liability, negligence, concealment, and conspiracy. The jury found Reynolds liable on the strict liability claim, but not on

- 5 -

the negligence, concealment, or conspiracy claims. The jury assigned 58% of the fault to Reynolds and 42% to Marotta and awarded total compensatory damages of $6 million (reduced to $3.48 million to reflect comparative fault determinations). Reynolds appealed the final judgment, and Marotta cross-appealed the trial court's decision to preclude the jury from considering punitive damages on the product liability claim. Marotta, 182 So. 3d at 830.

On appeal, the Fourth District affirmed. Id. In its opinion, the court wrote to specifically address Reynolds' argument that "because Congress has expressly sanctioned the sale of cigarettes, and because the practical effect of the Engle progeny litigation is to establish that all cigarettes are inherently dangerous and defective, strict liability and negligence claims are implicitly preempted by federal law allowing the sale of cigarettes." Id. at 831. The district court did not find merit in this argument, explaining that only certain tobacco claims are preempted by federal law, and "[w]hether a state law claim is preempted is dependent on the exact nature of that particular claim." Id. (quoting Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183, 1193 (11th Cir. 2004)). Federal law provides that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b) (2012) (emphasis added). The district court therefore

concluded that "[t]he central inquiry in each [preemption] case is . . . whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion.' " Marotta, 182 So. 3d at 831 (quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 523-24 (1992) (plurality opinion) (quoting 15 U.S.C. § 1334(b) (1988))). The district court therefore concluded that only state law claims related to the advertisement and promotion of cigarettes are preempted, but strict liability and negligence claims are not. Id. at 834.

The district court in Marotta acknowledged that the United States Court of Appeals for the Eleventh Circuit recently reached the opposite conclusion in Graham v. R.J. Reynolds Tobacco Co., 782 F.3d 1261 (11th Cir. 2015), reh'g en banc granted, opinion vacated, 811 F.3d 434 (11th Cir. 2016). In Graham, the federal court held that Engle progeny product liability claims are implicitly preempted by federal law. Id. at 1280. The court determined that the Engle "Phase I findings regarding strict-liability and negligence amount to the bare assertion that cigarettes are inherently defective—and cigarette manufacturers inherently negligent—because cigarettes are addictive and cause disease." Id. at 1281. The court concluded that Engle "imposed a common-law duty on cigarette manufacturers that they necessarily breached every time they placed a cigarette on

- 7 -

the market," and because such a duty operates as a ban on cigarettes, "it conflicts with Congress's clear purpose and objective of regulating—not banning—cigarettes." Id. at 1282. However, the circuit court conceded that federal law does not preempt all state law tort claims against tobacco companies; rather, it only preempts those claims that rely solely on Engle Phase I findings or are based on a theory of liability that all cigarettes are defective as a matter of law. Id. at 1284.

The Marotta court disagreed with the decision in Graham for several reasons. First, Marotta determined that Graham "overstates the effect of the past ten years of Florida tobacco case law by equating it to a ban on cigarette sales." Marotta, 182 So. 3d at 832. Second, Marotta disagreed with the Eleventh Circuit's conclusion that state governments cannot ban a product that Congress has chosen to regulate, stating it amounted to a blanket argument that "cannot withstand the test of experience and logic," citing federal regulation of alcohol as an example. Id. at 833. Further, the district court in Marotta noted that Graham relied in part on the Federal Cigarette Labeling and Advertising Act of 1965 (1965 Act or FCLAA), Pub. L. No. 89-92, 79 Stat. 282 (1965), to conclude that Congress intended to prevent states from banning the sale of cigarettes. See Graham, 782 F.3d at 1277-78. The district court in Marotta disagreed with the assertion that the FCLAA indicates any congressional "intent to preempt states from banning the sale of cigarettes, a state right traditionally reserved within a state's police powers, or

from permitting state tort claims relating to the production and sale of cigarettes." Marotta, 182 So. 3d at 833. The district court concluded that the FCLAA only demonstrates Congress's intent to establish uniform labeling and advertising requirements by preventing states from imposing their own requirements, a result that would have created a burden on the interstate commerce of cigarettes. Id.

The district court in Marotta also noted that Graham relied in part on a provision of the 2009 Family Smoking Prevention and Tobacco Control Act (FSPTCA), Pub. L. No. 111-31, 123 Stat. 1776 (2009), codified as 21 U.S.C. § 387a (2012), which grants the Food and Drug Administration (FDA) authority to regulate cigarettes, but specifically prohibits the FDA from banning them. See Graham, 782 F.3d at 1278-79. However, the district court observed that the FSPTCA contains no such prohibition on states from banning cigarettes. Marotta, 182 So. 3d at 833. The district court explained that, although the FSPTCA "expressly preempts states from regulating certain aspects of cigarette commerce, such as labeling and manufacturing, it [also] specifically acknowledges states' rights to regulate other aspects of tobacco, including a state's right to prohibit the sale of tobacco." Id. The district court concluded:

> [B]ecause Engle progeny cases do not support a conclusion that strict product liability claims amount to a ban on the sale of cigarettes, and because federal tobacco laws expressly preserve a state's ability to regulate tobacco in ways other than manufacturing and labeling while declining to "modify or otherwise affect any action or the liability of any person under the product liability law of any State," we find no

- 9 -

conflict between the applicable state and federal laws. Accordingly, the trial court did not err in rejecting the defendant's argument that negligence and strict liability claims are preempted by federal law.

Id. at 834. Nevertheless, the district court certified the question to this Court in acknowledgement of Graham's contrary holding. This review follows.

**ANALYSIS**

Whether state law is preempted by federal law is a pure question of law subject to de novo review. Vreeland v. Ferrer, 71 So. 3d 70, 73 (Fla. 2011).

The certified question in this case asks whether federal law implicitly preempts Marotta's strict liability and negligence claims as an Engle progeny plaintiff based on the sale of cigarettes. Reynolds contends that Congress, through decades of legislation, has established its intention to regulate cigarettes while foreclosing their removal from the market, and that any state law that conflicts with this objective is implicitly preempted. Reynolds argues that imposing tort liability for the sale of ordinary cigarettes amounts to a ban, and therefore such claims are preempted. Further, Reynolds insists that the liability imposed in Engle and Engle progeny cases was based on the inherent characteristics of cigarettes (namely, the presence of nicotine, which causes addiction and disease), thereby holding cigarette manufacturers liable for selling products that are sanctioned and protected by Congress.

- 10 -

In answering the certified question, we consider: (1) whether and to what extent federal law preempts state law tort claims against tobacco companies; and (2) whether Engle Phase I findings are based on the inherent characteristics of cigarettes such that these findings amount to a functional ban.

**Whether and to what extent federal law preempts state law tort claims against cigarette manufacturers**

Reynolds argues that Congress has completely foreclosed the removal of cigarettes from the market, and therefore any state action that attempts to do so is preempted.  In other words, Reynolds argues that because Congress chose to regulate but not ban cigarettes, it intended to continue their manufacture and sale and, therefore, preempt state law claims based on such manufacture and sale.  An initial question, then, is whether Congress intended to preclude the States from banning cigarettes, or more narrowly, whether it intended to preempt state law strict liability and negligence claims against cigarette manufacturers.

Federal preemption arises under three circumstances: (1) where Congress has expressly preempted state law; (2) where state law attempts to regulate a field that Congress intended the federal government to occupy exclusively; or (3) where state law actually conflicts with federal law, either because it would be impossible to comply with both federal and state regulations, or because the state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Vreeland, 71 So. 3d at 76 (quoting Hillsborough Cty.

- 11 -

v. Automated Med. Labs, Inc., 471 U.S. 707, 713 (1985)). At issue in Marotta is the latter form of conflict preemption, also known as obstacle preemption. It is therefore critical to ascertain the purposes and objectives of Congress, and whether the state law tort claims at issue "stand as an obstacle" to those purposes and objectives. However, there is a strong presumption against preemption, and "a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act." Chamber of Commerce v. Whiting, 563 U.S. 582, 607 (2011) (plurality opinion) (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 110 (Kennedy, J., concurring in part and concurring in judgment)). A preemption analysis begins "with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947).

Congressional purpose is "the ultimate touchstone in every pre-emption case." Vreeland, 71 So. 3d at 77 (quoting Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008)). Accordingly, we must first determine Congress's objectives in regulating tobacco products, and whether such objectives are impeded by the imposition of tort liability for injury caused by cigarettes.

Congress first addressed the health effects of cigarettes with the enactment of the FCLAA in 1965. The Act's express purpose is twofold: (1) to inform the

- 12 -

public that smoking cigarettes is a health hazard, and (2) to protect the tobacco industry from the burdens of complying with contradictory state regulations regarding the labels and advertisements of their products.  Pub. L. No. 89-92, § 2, 79 Stat. 282, 282 (1965) (codified at 15 U.S.C. § 1331 (2012)).  To accomplish this purpose, the FCLAA both mandated warnings on cigarette packages and expressly preempted state laws that would impose different or additional labeling or advertising requirements.  Id. §§ 4-5.

In 1969, Congress amended the FCLAA with the Public Health Cigarette Smoking Act of 1969 (1969 Act), Pub. L. No. 91-222, 84 Stat. 87 (1970).  The 1969 Act tightened regulations by strengthening warning labels and banning radio and television advertising of cigarettes.  The 1969 Act also modified the federal preemption provision.  The legislative history indicates that the reason for the modification was to clarify that "preemption is intended to include not only action by State statute but by all other administrative actions or local ordinances." S. Rep. No. 91-566 (1969), as reprinted in 1970 U.S.C.C.A.N. 2652, 2663.  The Senate Report further notes that "[t]he State preemption of regulation or prohibition with respect to cigarette advertising is narrowly phrased to preempt only state action based on smoking and health.[4]  It would in no way affect the

---

4. "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any

power of any State . . . with respect to the taxation or the sale of cigarettes to minors, or the prohibition of smoking in public buildings, or similar police regulations. It is limited entirely to State or local requirements or prohibitions in the advertising of cigarettes." Id.

The FCLAA was amended again in 1984 when Congress passed the Comprehensive Smoking Education Act with the stated purpose of "making Americans more aware of any adverse health effects of smoking, to assure the timely and widespread dissemination of research findings and to enable individuals to make informed decisions about smoking." Pub. L. No. 98-474, § 2, 98 Stat. 2200, 2200 (1984). The Comprehensive Smoking Education Act amended cigarette labeling requirements and compelled the Secretary of Health and Human Services to research and report on the effects of cigarette smoking. See 15 U.S.C. §§ 1333(a), 1341(a) (2012).

In 2009, the FSPTCA was signed into law. The FSPTCA accomplished a number of things, but most importantly, it gave the FDA authority to regulate tobacco products. 21 U.S.C. § 387a (2012). The FDA's authority is not unlimited, however. Among other things, the FDA may not ban tobacco products. Id.

---

cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b) (2012).

§ 387g(d)(3).  Importantly, the FSPTCA also included a savings clause that preserved certain state powers related to tobacco regulation.  See id. § 387p(a).

Reynolds asserts that through this legislation, Congress has made a deliberate choice to protect the market for ordinary cigarettes, despite their known and inherent health and addiction risks.  Reynolds cites the United States Supreme Court's decision in FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000), for the proposition that states may not ban cigarettes because "Congress . . . has foreclosed the removal of tobacco products from the market."  Id. at 137.  However, while it is clear Brown & Williamson held that the FDA was foreclosed from banning cigarettes,[5] it is also clear that this holding does not extend to the states.  In Brown & Williamson, a group of tobacco companies filed an action against the FDA for regulations it promulgated concerning tobacco products' promotion, labeling, and accessibility to children and adolescents.  Id. at 128-29.  The FDA promulgated the regulations based on its determination that it had the authority to do so because "nicotine is a 'drug' and . . . cigarettes . . . are 'drug delivery devices,' and therefore it had jurisdiction under the FDCA [Food, Drug, and Cosmetic Act] to regulate tobacco products."  Id. at 127.  The tobacco companies argued that the regulations were beyond the FDA's jurisdiction because

_____

5.  Brown & Williamson was decided before the enactment of the FSPTCA, which granted the FDA the authority to regulate tobacco products.

- 15 -

Congress had not granted the FDA the authority to regulate tobacco. Id. at 129-30. Considering the FDCA as a whole, the Supreme Court agreed, and concluded that Congress intended to exclude tobacco products from the FDA's jurisdiction. Id. at 133-34, 142. In reaching its decision, the Court observed that "[a] fundamental precept of the FDCA is that any product regulated by the FDA—but not banned— must be safe for its intended use." Id. at 142. The FDA had already "exhaustively documented that 'tobacco products are unsafe,' 'dangerous,' and 'cause great pain and suffering from illness.' " Id. at 134 (quoting Restricting Sale and Distribution of Cigarettes and Smokeless Tobacco, 61 Fed. Reg. 44,396, 44,412 (1996)). The Court explained that if tobacco products were within the FDA's jurisdiction, they would have to be banned because it would be impossible to prove they were safe for their intended use. Id. at 135. The Court determined that Congress had foreclosed such a ban, choosing instead to create a distinct regulatory scheme focusing on the labeling and advertising of tobacco products. Id. at 155. Therefore, the Supreme Court concluded that Congress intended to exclude tobacco products from the FDA's jurisdiction because a ban by the FDA would contradict congressional policy. Id. at 142.

However, while Brown & Williamson held that the FDA did not have the authority to regulate tobacco products, it said nothing about the states' power to do the same. The Supreme Court's analysis focused primarily on whether Congress

had granted the FDA, as a federal agency, such regulatory authority.  See Berger v.

Philip Morris USA, Inc., 185 F. Supp. 3d 1324 (M.D. Fla. 2016), appeal docketed,

No. 16-15957 (11th Cir. Ct. Sept. 13, 2016).  In Berger, the United States District

Court for the Middle District of Florida stated:

> Brown & Williamson is not a case about preemption of state law.  It
> is, rather, a case about whether Congress delegated authority to an
> executive agency to promulgate rules about and regulations relating to
> tobacco.  Such delegation implicates congressional goals for what it
> wanted federal law to achieve or not to achieve.
>
>  . . . Brown & Williamson's discussion of congressional objectives
> with respect to cigarettes supports only the unremarkable contention
> that Congress itself did not wish to remove cigarettes from the
> national market.  It does not support the more extreme inference that
> Congress intended to displace state police powers in regulating
> cigarettes.

Id. at 1341 (citations omitted).  We agree with this conclusion reached by the

district court.

Reynolds further asserts that the imposition of tort liability for the sale of

cigarettes would undermine Congress's express intention under the FCLAA to

protect the "commerce and national economy" of the tobacco industry.  However,

the context in which Congress enacted the FCLAA is helpful in interpreting

congressional intentions.  In 1964, the Surgeon General's Advisory Committee

issued a report discussing the hazard that cigarette smoking poses to health.  As a

result, the Federal Trade Commission (FTC) and several states moved quickly to

regulate the advertising and labeling of cigarettes.  See Cipollone, 505 U.S. at 513.

In response to the actions by the FTC and the states, Congress enacted the FCLAA

the following year.  See Richardson v. R.J. Reynolds Tobacco Co., 578 F. Supp. 2d

1073, 1077 n.2 (E.D. Wisc. 2008).  "Thus, Congress clearly intended to 'protect

the national economy from the burden imposed by diverse, nonuniform, and

confusing cigarette labeling and advertising regulations,' but did not clearly intend

to extend broad immunity from common law liability to cigarette manufacturers."

Id. at 1077 (quoting Cipollone, 505 U.S. at 514).

Further, the majority of state[6] and federal[7] court decisions that have

addressed the question of federal preemption in tobacco product liability cases

_____

6. See, e.g., Cantley v. Lorillard Tobacco Co., 681 So. 2d 1057 (Ala. 1996) (smoker's fraudulent suppression claim based on state law duty to disclose was preempted by FCLAA, but defective design claim was not); People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., 124 P.3d 408 (Cal. 2005) (FCLAA did not preempt state statute regulating free distribution of cigarettes); Forster v. R.J. Reynolds Tobacco Co., 437 N.W.2d 655 (Minn. 1989) (FCLAA preempts failure to warn claims, but not state law claims for strict liability for unsafe design of cigarette or defective conditions; negligence claim preempted only to extent it was based on breach of duty to warn about hazards of smoking); American Tobacco Co. v. Grinnell, 951 S.W.2d 420 (Tex. 1997) (FCLAA and 1969 Act preempted strict liability and negligence claims only to extent they were related to advertising, promotion, or failure to warn).

7. See, e.g., Altria Grp., Inc. v. Good, 555 U.S. 70, 91 (2008) (FCLAA "does not pre-empt state-law claims . . . that are predicated on the duty not to deceive" because such regulations do not pertain to the content of any advertising); Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183 (11th Cir. 2004) (state law breach of warranty claim was not preempted by FCLAA); Richardson v.

have held that Congress only intended to preempt state laws to the extent that they relate to labeling or advertising of tobacco products.  Indeed, a plurality of the United States Supreme Court came to this conclusion after examining the scope of the preemption provisions within the FCLAA and the 1969 Act.  Cipollone, 505 U.S. 504.  In Cipollone, a smoker filed an action in federal court against cigarette manufacturers under various theories, including strict liability and negligence.  Id. at 509.  The tobacco companies argued that the FCLAA and the 1969 Act preempted Cipollone's common law tort claims and protected their conduct after 1965.  Id. at 510.  The Court compared the precise language of the 1965 preemption provision[8] with the broader language contained in the 1969 revisions.[9] Cipollone, 505 U.S. at 520.  A majority of the Court held that "the 1965 Act only pre-empted state and federal rulemaking bodies from mandating particular

---

R.J. Reynolds Tobacco Co., 578 F. Supp. 2d 1073, 1076 (E.D. Wisc. 2008) ("[T]he FCLAA preempts only claims related to advertising and promotion.").

8. "No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."  15 U.S.C. § 1334(b) (Supp. III 1964) (emphasis added).

9. "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b) (1982) (emphasis added).

cautionary statements and did not pre-empt state-law damages actions." Id. at 519-20. The Court observed:

> [T]here is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common-law damages actions. For example, in the Comprehensive Smokeless Tobacco Health Education Act of 1986, Congress expressly pre-empted state or local imposition of a "statement relating to the use of smokeless tobacco products and health" but, at the same time, preserved state-law damages actions based on those products.

Id. at 518 (footnote omitted). The Court also noted that such a reading comports with the 1965 Act's purpose to avoid "diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." Id. at 519 (emphasis omitted) (quoting 1965 Act § 2). However, the Court was divided as to how the amended language in the 1969 Act affected the scope of federal preemption. The plurality determined that the Act does not preempt all common law claims, such as "state-law obligations to avoid marketing cigarettes with manufacturing defects or to use a demonstrably safer alternative design for cigarettes." Id. at 523. The plurality concluded that the question of preemption is case and claim specific:

> [W]e must fairly but—in light of the strong presumption against pre-emption—narrowly construe the precise language of [the Act's preemption provision] and we must look to each of petitioner's common-law claims to determine whether it is in fact pre-empted. The central inquiry in each case is straightforward: we ask whether the legal duty that is the predicate of the common-law damages action constitutes a "requirement or prohibition based on smoking and health

. . . imposed under State law with respect to . . . advertising or promotion," giving that clause a fair but narrow reading.

Id. at 523-24 (plurality opinion) (footnote omitted) (quoting 1969 Act § 5(b)). The plurality determined that the 1969 Act preempted the petitioner's "claims based on a failure to warn and the neutralization of federally mandated warnings to the extent that those claims rely on omissions or inclusions in respondents' advertising or promotions," but not the petitioner's express warranty, intentional fraud and misrepresentation, and conspiracy claims. Id. at 530-31.

Overall, the history of federal tobacco legislation shows that Congress sought to create a balanced regulatory scheme, first and foremost to educate the public about the health hazards of smoking, and "[s]econdarily, . . . to create uniform rules regarding the regulation of tobacco advertising, to recognize the economic importance of the tobacco industry and to confirm the individual's 'right to choose to smoke or not to smoke.' " Richardson, 578 F. Supp. 2d at 1078 (quoting H.R. Rep. No. 89-449 (1965) as reprinted in 1965 U.S.C.C.A.N. 2350, 2352). We hold that permitting Engle progeny plaintiffs to bring state law strict liability and negligence claims against Engle defendants does not conflict with these objectives. While Congress did expressly preempt state and local regulations pertaining to the labeling and advertising of cigarettes, there is no indication that Congress had a "clear and manifest purpose" to insulate the tobacco industry from

state tort liability. Strict liability and negligence claims, such as those brought by Marotta under <u>Engle</u>, do not interfere with the regulation of advertising and promotion of cigarettes and, therefore, do not clearly conflict with congressional objectives. This determination is consistent with congressional intent as evidenced by Congress's explicitly stated purpose of the FCLAA, and also with the inclusion of "savings clauses" in the legislation that preserves product liability actions under state law. <u>See</u> 21 U.S.C. § 387p(a)(1), (b) (Supp. 2009); 15 U.S.C. § 4406(c) (2006). While Reynolds argues that these acts—and consequently, their savings clauses—are inapplicable here by their own terms (namely, that 15 U.S.C. § 4406 governs only smokeless tobacco, and 21 U.S.C. § 387p was enacted in 2009 and does not apply to cases pending before its effective date), we conclude that the inclusion of these clauses is indicative of Congress's general intent to preserve state law tort remedies against cigarette manufacturers.

### Factual Basis for <u>Engle</u> Phase I Findings

Even if Congress did intend to prevent the states from banning cigarettes, it is clear that tort liability like that in <u>Engle</u> does not amount to such a ban. Reynolds' entire preemption argument is based on its assertion that <u>Engle</u> imposes liability for the sale of "ordinary" cigarettes containing nicotine.[10] Reynolds

---

10. The certified question itself focuses on this aspect of Reynolds' argument, asking "[w]hether federal law implicitly preempts state law tort claims

argues that imposing tort liability based on the inherent risks involved with smoking amounts to a ban on cigarettes because it creates a common law duty that tobacco companies necessarily breach every time they place a cigarette on the market. Reynolds therefore concludes that because Congress has foreclosed the removal of tobacco from the market, these state tort claims that equate to a ban are impliedly preempted by federal law. However, Reynolds concedes that federal law does not preempt all product liability claims against cigarette manufacturers, such as those based on a theory of defect narrower than the inherent dangerousness of all cigarettes. Therefore, a critical question is whether Engle defendants' liability is based solely on the inherent dangers of cigarettes. We hold that it is not.

Several aspects of Engle, such as the class complaint, the verdict form instructions, and the Phase I jury findings, indicate that the inherent characteristics of all cigarettes did not form the sole basis for liability. Rather, the case was premised on the allegation that the Engle defendants intentionally increased the amount of nicotine in their products to ensure that consumers became addicted.

First, as the Engle class complaint itself demonstrates, class members did not allege that the defendants should be held liable solely because of the inherent dangers of all cigarettes. For example, the named defendants did not include all

---

of strict liability and negligence . . . based on the sale of cigarettes." Marotta, 182 So. 3d at 834 (emphasis added).

- 23 -

cigarette manufacturers or distributers who sold cigarettes in Florida. Instead, the complaint described the defendants as "manufacturers and distributors of tobacco products . . . containing the chemical nicotine; said Defendants <u>manipulated the level of nicotine in their tobacco products so as to make these products addictive</u>." (emphasis added). Amended Class Action Complaint for Compensatory and Punitive Damages at 8-9, <u>Engle v. R.J. Reynolds Tobacco Co.</u>, No. 94-08273 CA (Fla. 11th Cir. Ct. May 10, 1994). Likewise, the class members did not consist of every consumer of defendants' cigarettes. Instead, the class was described as those consumers who were <u>addicted</u> to cigarettes, continued to smoke and were unable to quit because of their addiction, and suffered death or disease as a result.[11]

In addition, the complaint alleges repeatedly that the defendants intentionally manipulated nicotine levels in their products. For example, the common questions of fact and law asked whether the defendants "manipulated the levels of nicotine in their tobacco products"; "intentionally caused the level of nicotine to rise in low tar cigarettes so as to keep smokers of low tar cigarettes addicted to nicotine"; "intentionally miscalculate[d] and inaccurately measure[d] the levels of tar and nicotine in cigarettes so as to understate same and deceive the

_____

11. The class was certified as including all Florida "citizens and residents, and their survivors, who have suffered, presently suffer or have died from diseases and medical conditions by their addiction to cigarettes that contain nicotine." <u>Engle I</u>, 672 So. 2d at 40-42.

- 24 -

consuming public"; and "[w]hether more nicotine is inhaled by the smoker in low tar cigarettes, due to the intentional manipulation of the level of nicotine and the design of the cigarette and filter by the [defendants]." Amended Class Action Complaint at 12-18.

The strict liability claim was based on the allegation that "Defendants' tobacco products, containing manipulated levels of nicotine, as intentionally manipulated by these Defendants, which caused Plaintiffs and members of the class to become addicted to nicotine upon personal consumption, constitute products that are unreasonably dangerous and defective." Amended Class Action Complaint at 38. Likewise, the negligence claim alleged that defendants breached their duty of reasonable care to the class by:

> (a) failure to design and manufacture products that were not addictive;
> (b) failure to design and manufacture tobacco products that did not contain an unreasonable level of nicotine; . . . (d) failure to take any reasonable precautions or exercise reasonable care to adequately or sufficiently reduce or remove the level of nicotine in cigarettes so that smokers would have the ability to quit; (e) failure to utilize a safer design that was readily available to Defendants, so that smokers could purchase a nicotine free cigarette; (f) failure to utilize accurate measurements as to levels of true nicotine yield and tar in "low tar" cigarettes.

Amended Class Action Complaint at 50-51. It is clear, then, that the class complaint did not merely allege that the defendants sold their cigarettes despite knowing that the nicotine within their products was addictive and carcinogenic. Nor did the complaint allege that the defendants' cigarettes were defective and

- 25 -

dangerous merely for containing nicotine. Rather, the complaint alleged that the defendants not only knew that nicotine was addictive and carcinogenic, but intentionally increased the amount of nicotine in their products to ensure their consumers became and remained addicted. It alleged that the cigarettes were defective precisely because of this manipulation.

Second, the Engle Phase I verdict form did not presuppose that all cigarettes are inherently defective or that all cigarette manufacturers are inherently negligent. See Berger, 185 F. Supp. 3d at 1334. The jury was first asked to determine if nicotine is addictive and carcinogenic, and then whether each defendant had placed cigarettes on the market that were defective and unreasonably dangerous. As the federal district court in Berger explained:

> [I]f strict liability were founded merely on those properties [addictive and carcinogenic], the strict liability question would simply have asked whether each defendant "place[d] cigarettes on the market"— period. But the strict liability inquiry did not end there. The court asked the jury to determine discretely whether each of the seven defendants "place[d] cigarettes on the market that were defective and unreasonably dangerous." The jury determined that each defendant did. Assuming the jury followed its instructions, what it actually decided is that each defendant's particular cigarettes were defective, not that all cigarettes are inherently defective.

Id. (citations omitted). Similarly, on the question of negligence, the jury was asked if each defendant "failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances." Verdict Form for Phase I

- 26 -

at 10, Engle v. R.J. Reynolds Tobacco Co., No. 94-08273 CA (Fla. 11th Cir. Ct. July 7, 1999). This standard assumes that it is possible for cigarettes to be sold in a reasonable manner. See Philip Morris USA, Inc. v. Lourie, 198 So. 3d 975, 980 (Fla. 2d DCA 2016). Accordingly, the jury was required to determine how a "reasonable" cigarette manufacturer would behave and whether the Engle defendants conformed to this standard. Therefore, the verdict form clearly indicates that the jury found that the Engle defendants' cigarettes were defective, not that all cigarettes are inherently defective.

Third, in denying the Engle defendants' motion for directed verdict, the trial court's statements regarding the sufficiency of the evidence indicates that the jury considered much more than the mere sale of cigarettes containing nicotine:

> There was more than sufficient evidence at trial to satisfy the legal requirements of [the strict liability count] and to support the jury verdict that cigarettes manufactured and placed on the market by the defendants were defective in many ways including the fact that the cigarettes contained many carcinogens, nitrosamines, and other deleterious compounds such as carbon monoxide. That levels of nicotine were manipulated, sometime[s] by utilization of ammonia to achieve a desired "free basing effect" of pure nicotine to the brain, and sometime[s] by using a higher nicotine content tobacco called Y-1, and by other means such as manipulation of the levels of tar and nicotine. The evidence more than sufficiently proved that nicotine is an addictive substance which when combined with other deleterious properties, made the cigarette unreasonably dangerous. The evidence also showed some cigarettes were manufactured with the breathing air holes in the filter being too close to the lips so that they were covered by the smoker thereby increasing the amount of the deleterious effect of smoking the cigarette. There was also evidence at trial that some

> filters being testmarketed utilize glass fibers that could produce disease and deleterious effects if inhaled by a smoker.

Engle v. R.J. Reynolds Tobacco, No. 94-08273 CA-22, 2000 WL 33554572 at *2 (Fla. 11th Cir. Ct. Nov. 6, 2000) (emphasis added).

In addition, although Marotta's claims were necessarily based on the Engle Phase I findings, the record reflects that the jury in this case heard evidence that Reynolds manipulated the level of nicotine in its cigarettes. For example, an expert witness for Marotta testified regarding the techniques utilized by the tobacco industry, including Reynolds, to control the amount of nicotine in their products.[12] In addition, the allegation that Reynolds intentionally engineered its cigarettes to addict consumers was reiterated to the jury during opening and closing statements.

Reynolds contends that numerous state and federal decisions have held that federal law preempts state strict liability and negligence claims against cigarette manufacturers based on the health and addiction risks of all cigarettes. Reynolds cites Liggett Group, Inc. v. Davis, 973 So. 2d 467 (Fla. 4th DCA 2007), as an example. In Davis, plaintiffs filed an action against Liggett under theories of

---

12. One expert witness for Marotta testified that the level of nicotine in tobacco leaves can be manipulated through the way the tobacco plant is grown (e.g., how tightly the plants are grown together and how much fertilizer is used), and by which tobacco leaves are selected for blending (e.g., top leaves contain more nicotine than lower leaves).

negligence and defective design. Id. at 469. Liability was sought against Liggett "for continuing to manufacture cigarettes when it became known to Liggett that they posed a significant danger to the health of smokers." Id. at 472. The district court determined that, "[i]f Congress gives express sanction to an activity, the states cannot declare that activity tortious." Id. at 471 (quoting Insolia v. Philip Morris Inc., 128 F. Supp. 2d 1220, 1224 (W.D. Wis. 2000)). The court held that "the negligence claim based on Liggett's mere continuing to manufacture cigarettes is barred by conflict preemption," because "to allow this claim would be contrary to Congress' intent to protect commerce and not to ban tobacco products." Id. at 472-73.

However, Davis is distinguishable because it is not an Engle progeny case. Davis revolved around the premise that liability was sought for the inherent dangerousness of cigarettes. On the other hand, as previously discussed, the jury in Engle found that the defendants had placed unreasonably dangerous cigarettes on the market based on the fact that they had manipulated the nicotine levels in their products. Further, the Fourth District issued the decisions in both Davis and Marotta. Read together, the Fourth District has taken the position that civil suits against tobacco companies are only preempted to the extent that they seek liability for the sale of "ordinary" cigarettes, but because Engle imposed liability for something more, progeny claims are not preempted. Indeed, in Davis, the court

- 29 -

observed that "a design defect claim against a cigarette manufacturer is not preempted by federal statutes." Id. at 472. Alternatively, to the extent that these cases do conflict, the difference could be attributed to a change in the Fourth District's position regarding implied conflict preemption in tobacco product liability cases. See Little v. State, 206 So. 2d 9, 10 (Fla. 1968) (holding that where intradistrict conflict exists, the decision later in time overrules the former as the decisional law in the district).

Reynolds also argues that Engle tort claims are preempted to the extent that they seek to impose liability for conduct that Congress has specifically allowed, citing the United States Supreme Court's decision in Geier v. American Honda Motor Co., Inc., 529 U.S. 861 (2000). However, this argument again presupposes that Engle imposes liability based solely on the inherent characteristics of cigarettes. As previously discussed, Engle imposed liability for more than the mere sale of ordinary cigarettes. Additionally, Geier is distinguishable from Engle and Marotta. In Geier, the Court held that federal law preempted strict liability and negligence claims based on an automobile manufacturer's failure to install airbags because the governing federal regulations specifically allowed manufacturers "a range of choices among different passive restraint devices," including, but not limited to, airbags. Id. at 875. The Court explained that the plaintiffs' tort action "depend[ed] upon its claim that manufacturers had a duty to install an airbag" and

"would have required manufacturers of all similar cars to install airbags rather than other passive restraint systems." Id. at 881. Because that claim "presented an obstacle to the variety and mix of devices that the federal regulation sought," it was impliedly preempted. Id. This is distinguishable from the federal regulations at issue here. Federal tobacco regulations have not explicitly allowed the type of conduct underlying Engle claims, namely, the intentional manipulation of nicotine levels. Federal regulation does identify a range of acceptable conduct relating to the advertising and labeling of cigarettes; however, the claims at issue here are not related to either area. See Berger, 185 F. Supp. 3d at 1341-42 (holding that Engle progeny plaintiffs' strict liability and negligence claims were not preempted by federal law, and distinguishing Geier).

## PUNITIVE DAMAGES

Although Marotta sought punitive damages in his individual action against Reynolds, the trial court precluded the jury from considering it, and the Fourth District affirmed on appeal. Marotta, 182 So. 3d at 830. However, later that year, we issued our decision in Soffer v. R.J. Reynolds Tobacco Co., 187 So. 3d 1219, 1221 (Fla. 2016), holding that "individual members of the Engle class action are not prevented from seeking punitive damages on all claims properly raised in their subsequent individual actions." Therefore, because Soffer was decided after the

- 31 -

Fourth District issued its opinion in <u>Marotta</u>, we quash the Fourth District's decision on punitive damages, based on our decision in <u>Soffer</u>.

**CONCLUSION**

In sum, although Reynolds insists that <u>Engle</u> imposed liability for the sale of ordinary cigarettes containing nicotine, the records in both <u>Engle</u> and <u>Marotta</u> do not support this argument. While the <u>Engle</u> jury did make findings based on the inherent addictiveness and carcinogenic nature of cigarettes containing nicotine, such findings were not the sole basis of liability. Instead, the record in <u>Engle</u> reflects that the claims were grounded in allegations that <u>Engle</u> defendants deliberately manufactured their products to increase the likelihood of addiction, despite defendants' knowledge of the hazards of nicotine, and that <u>Engle</u> plaintiffs suffered disease and death as a result of their inability to quit.

We therefore rephrase the certified question as follows to eliminate the suggestion that the <u>Engle</u> Phase I findings were based on the mere sale of cigarettes:

> WHETHER FEDERAL LAW IMPLICITLY PREEMPTS STATE
> LAW TORT CLAIMS OF STRICT LIABILITY AND
> NEGLIGENCE BY <u>ENGLE</u> PROGENY PLAINTIFFS.

We answer this question in the negative and approve the district court's decision in this regard. However, as previously discussed, we quash the portion of the district court's decision that affirmed the trial court's determination that the jury should be

- 32 -

precluded from considering punitive damages, and remand to the district court for proceedings consistent with this opinion.

It is so ordered.

PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY and POLSTON, JJ., concur in result.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal – Certified Great Public Importance

     Fourth District - Case No. 4D13-1703

     (Broward County)

Charles R.A. Morse of Jones Day, New York, New York; and Eric L. Lundt and Robert C. Weill of Sedgwick LLP, Miami, Florida,

     for Petitioner

Philip Freidin of Freidin Brown, P.A., Miami, Florida; Richard B. Rosenthal of the Law Offices of Richard B. Rosenthal, P.A., Miami, Florida; Alex Alvarez of The Alvarez Law Firm, Coral Gables, Florida; Randy Rosenblum of Dolan Dobrinsky Rosenblum, LLP, Miami, Florida; and Robert E. Schack, Miami, Florida,

     for Respondent

Celene H. Humphries, Maegen P. Luka, and Thomas J. Seider of Brannock & Humphries, Tampa, Florida,

     for Amicus Curiae Florida Justice Association

John S. Mills and Courtney Brewer of The Mills Firm, Tallahassee, Florida,

     for Amicus Curiae *Engle* Plaintiffs' Firms