DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**PHILIP MORRIS USA INC.,**
Appellant,

v.

**BERNICE MCCALL,** individually and as Personal Representative of the
Estate of **MARTIN MCCALL,**
Appellee.

No. 4D16-2016

[December 13, 2017]

Appeal and cross-appeal from the Circuit Court for the Seventeenth
Judicial Circuit, Broward County; John J. Murphy III, Judge; L.T. Case
No. 2007CV36888 (19).

David F. Northrip and William P. Geraghty of Shook Hardy & Bacon
LLP, Kansas City, Missouri, and Miami, and Frances Daphne O'Connor
and Geoffrey J. Michael of Arnold & Porter Kaye Scholer LLP, Washington,
DC, for appellant.

Shea T. Moxon, Celene H. Humphries, Maegen Peek Luka and Thomas
J. Seider of Brannock & Humphries, Tampa, and Alex Alvarez of The
Alvarez Law Firm, Coral Gables, and Jordan L. Chaikin of Chaikin Law
Firm PLLC, Fort Myers, for appellee.

DAMOORGIAN, J.

In this *Engle*[1] progeny case, Philip Morris USA Inc. ("PM") appeals a
final judgment entered in favor of Bernice McCall ("Plaintiff"), individually
and as the personal representative of the estate of Martin McCall
("Decedent"), on her survival and loss of consortium claims. PM argues
that the loss of consortium award must be vacated because the claim was
barred by the applicable statute of limitations. PM also argues, as it does
in every *Engle* appeal, that the court's application of the *Engle* common
core findings violated its due process rights. Plaintiff cross-appeals,
asserting that the court erred in instructing the jury on the elements
necessary to establish fraudulent concealment and conspiracy to commit

---

[1] *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246 (Fla. 2006).

fraudulent concealment as well as the legal effect of cigarette warning labels. Additionally, Plaintiff argues that the court erred in reducing the jury's award by its allocation of the Decedent's comparative fault. We continue to reject PM's due process argument based on *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 435–36 (Fla. 2013), and likewise reject Plaintiff's comparative fault argument based on *R.J. Reynolds Tobacco Co. v. Schoeff*, 178 So. 3d 487, 495–96 (Fla. 4th DCA 2015). We also find no error in the court's instructions on Plaintiff's fraudulent concealment and conspiracy to commit fraudulent concealment claims. However, we find merit in both parties' remaining positions and, for the reasons set forth below, reverse and remand for a new trial.

## The Facts

Plaintiff sued PM pursuant to *Engle*, alleging that her deceased husband died from lung cancer caused by an addiction to smoking cigarettes manufactured and marketed by PM. Plaintiff alleged causes of action for strict liability, fraud by concealment, conspiracy to commit fraud by concealment, and negligence. Plaintiff sought relief for her negligence claims under the Florida Wrongful Death Act and, in the alternative, asserted a survival claim for damages based on the injuries suffered by Decedent prior to his death.[2] In conjunction with her alternative survival claim, Plaintiff also asserted a loss of consortium claim. In response, PM asserted several affirmative defenses, including bar by the statute of limitations.

The case was set to be tried in two phases. In the first phase, the jury was asked to determine if Decedent was a member of the *Engle* class and, if so, liability, compensatory damages, and entitlement to punitive damages. The second phase was reserved for the determination of the proper amount of punitive damages, if any.

---

[2] Plaintiff's alternative survival claim is dubbed a "survival" claim due to the survival action statute, section 46.021, Florida Statutes (2007), which preserves actions the decedent filed or may have filed prior to his or her death. Based on this statute, a personal representative may bring and maintain a personal injury action on behalf of the decedent. If, however, the personal injury was the cause of the decedent's death, the personal injury action "abates" and becomes a wrongful death cause of action under the Florida Wrongful Death Act. § 768.20, Fla. Stat. (2007). "[I]t is permissible for a personal representative to pursue both a claim for survival damages and an alternative wrongful death claim where the cause of the decedent's death may be disputed by the parties." *Capone v. Philip Morris USA, Inc.*, 116 So. 3d 363, 378 (Fla. 2013).

<u>Evidence</u>

During the first phase of trial, Plaintiff presented the following evidence concerning the Decedent's smoking history, illness, and death.

Decedent was born in 1940 and began smoking cigarettes in the early 1950s when he was twelve or thirteen years old and continued to smoke them for the next thirty-plus years. Plaintiff testified that when she met Decedent in 1971, he was smoking about a pack a day. Decedent primarily smoked cigarettes with filters, which according to Plaintiff, Decedent believed were "safe" to smoke. Plaintiff testified that Decedent's belief came from advertisements, specifically Parliament advertisements, which stated that cigarettes with filters were "lower in tar and nicotine." Decedent went so far as to cut out the filter of a smoked cigarette and show it to Plaintiff, explaining that the black spots on the filter were the filtered-out nicotine and tar.

Decedent was diagnosed with lung cancer in September of 1992, when he was 52 years old. Shortly after his diagnosis, Decedent underwent surgery to remove a cancerous lobe of his right lung. After his discharge from the hospital, Decedent began radiation and chemotherapy treatment. Not long thereafter, Decedent was readmitted to the hospital for breathing complications. Decedent died in the hospital in November of 1992. The causes of death listed on Decedent's death certificate were "adult respiratory distress syndrome" and "possible fungal pneumonia."

Plaintiff also presented testimony from several experts concerning the actions of the tobacco companies and the health effects of smoking. This testimony, like the testimony in almost every *Engle* case, established that the tobacco companies knew of the addictive nature of nicotine and the harmful effects of smoking well before the public health community did and, over a fifty-year period of time, took concerted efforts to obfuscate this information while encouraging people to smoke through marketing efforts. For example, the tobacco companies marketed filtered cigarettes as having fewer health risks because they contained less tar and nicotine when in fact, they knew the opposite.

<u>PM's Motion for Directed Verdict</u>

At the close of Plaintiff's evidence, PM moved for a directed verdict on Plaintiff's alternative loss of consortium claim. PM argued that Plaintiff's claim accrued, at the latest, when Decedent died in 1992. As Plaintiff did not file her suit until 2007, nearly fifteen years later, PM maintained that Plaintiff's loss of consortium claim was barred by the applicable four-year

statute of limitations. Plaintiff countered that as Decedent's survivor, she was an *Engle* class member and, therefore, was entitled to the tolling effect of the initial *Engle* lawsuit filing. The court agreed with Plaintiff and denied PM's motion.

Jury Instructions

On the reliance element of Plaintiff's fraudulent concealment claim, the court instructed the jury as follows:

> On this claim, the issue for your determination is whether [Decedent] reasonably relied to his detriment on any statement of material fact by PM USA that concealed or omitted material information not otherwise known or available concerning the health effects or addictive nature of smoking cigarettes and, if so, whether such reliance was a legal cause of [Decedent's] lung cancer.

Similarly, the conspiracy instruction contained the following direction:

> On this claim, the issue for your determination is whether [Decedent] reasonably relied to his detriment on statements made in furtherance of PM USA's agreement to conceal or omit information concerning the health effects or addictive nature of cigarettes; and, if so, whether such reliance was a legal cause of his lung cancer.

Plaintiff opposed these instructions, arguing that requiring reliance on a "statement" was too narrow because it precluded liability based solely on fraudulently concealed information. Instead, Plaintiff argued that the jury should be instructed that PM could be liable if Decedent "reasonably relied to [his] detriment on an act or omission taken in furtherance of [PM's] agreement to conceal or omit information concerning the health effects or addictive nature of cigarettes . . . ."

Per PM's request, the court also provided the jury with the following instruction on the effect of cigarette warning labels:

> The warning labels placed on cigarette packs by [PM] and other tobacco companies complied with federal law. After July 1, 1969, [PM], and other tobacco companies had no obligation to place any additional warnings on their cigarette packages.

Further, as long as the cigarette packs bear the federally mandated warnings, cigarette advertising after July 1, 1969 cannot be the subject of any claim that the advertising undermined or neutralized the warnings or made them less effective.

Plaintiff objected to this instruction, arguing that it was inapplicable because she was not bringing a failure to warn claim. Alternatively, Plaintiff argued that the instruction implied PM was without liability for cigarettes sold after July 1, 1969 so long as there were labels on the packs. Therefore, Plaintiff asserted that the instruction should include language making it clear that PM could still be liable for false and misleading information provided in its advertising. The court rejected Plaintiff's arguments and provided the instruction requested by PM.

### Closing Arguments

During its closing argument, PM's counsel repeatedly referred to the opposed warning label instruction. After arguing for some time that Decedent was not truly addicted to cigarettes, PM's counsel then argued that, contrary to Plaintiff's testimony, Decedent did not smoke filtered cigarettes because he thought they were safe. It then asked the jury to consider the cigarette warning label instruction, stating that "the instruction kills the plaintiff's whole claim. Kills the plaintiff's whole claim." Plaintiff objected to this argument and, although the court sustained her objection, PM's counsel continued by arguing: "When you go back and you read the instructions and you consider the evidence, you'll see that the plaintiff can't maintain their claim when you consider the evidence we've just talked about and the court's instructions."

### The Verdict

In its verdict, the jury found that Decedent was a member of the *Engle* class by virtue of its finding that Decedent was addicted to cigarettes containing nicotine and that such addiction was the legal cause of his lung cancer. It also found that smoking cigarettes manufactured by PM was a legal cause of Decedent's lung cancer. However, the jury found that lung cancer was not a legal cause of Decedent's death. Accordingly, the jury did not award any wrongful death damages. It did, however, find in favor of Plaintiff on her alternative survival and loss of consortium claims and awarded Plaintiff $175,000 for Decedent's pain and suffering and $175,000 for Plaintiff's loss of consortium.

5

The jury found in favor of PM on both of Plaintiff's intentional tort claims, finding that Decedent did not reasonably rely to his detriment on any statement made by PM which concealed or omitted material information not already known or available to him and that, likewise, Decedent did not reasonably rely to his detriment on any statement made in furtherance of PM's agreement with other tobacco companies to conceal or omit material information. Based on the jury's intentional tort findings, the matter did not proceed to the punitive phase. This appeal and cross-appeal follows.

## **Analysis**

### On Direct Appeal

PM argues that the court erred in denying its statute of limitations based motion for directed verdict on Plaintiff's loss of consortium claim. Plaintiff counters that the court ruled correctly because she, individually, is an *Engle* class member and, in the alternative, her loss of consortium claim was timely because it was "intertwined" with the survival claim she brought on behalf of Decedent. We hold that Plaintiff's claim was time barred.

Our analysis on this issue necessarily begins with some procedural background on the *Engle* class. The now-voluminous *Engle* litigation commenced on May 5, 1994, when a group of smokers filed a class action lawsuit against numerous tobacco industry organizations and cigarette companies, including PM, seeking damages for smoking-related illnesses and deaths. *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 693 (Fla. 2015). On November 21, 1996, the trial court recertified the *Engle* class as the more than 700,000 Florida "citizens and residents, and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." *Engle*, 945 So. 2d at 1274, 1258. The Florida Supreme Court later confirmed that the class recertification date was the class membership cut-off date. *Id.* at 1275. Based on the foregoing, the filing of the *Engle* lawsuit tolled the statute of limitations for *Engle* class member causes of action accruing no earlier than May 5, 1990 (four years before the filing date) and no later than November 21, 1996 (the class recertification and membership cut-off date). *See R.J. Reynolds Tobacco Co. v. Ciccone*, 190 So. 3d 1028, 1042 (Fla. 2016) (Polston, J., dissenting) (explaining the effects of the filing and membership cut-off dates).

The *Engle* class action jury went on to find the tobacco defendants liable for the class' injuries and in doing so, made a myriad of "common core"

6

findings regarding the health effects of smoking cigarettes, the addictive properties of nicotine, and the tobacco companies' actions. *Engle*, 945 So. 2d at 1257 n.4. After prolonged litigation regarding the propriety of continued class action treatment, on December 21, 2006, the Florida Supreme Court decertified the class and vacated the class action jury's punitive damages award. *Id.* at 1254. However, the court "did not decertify the class in the traditional sense, but conferred upon the class members two benefits: (1) each class member's time to file an individual suit would be equitably tolled to allow filing within one year of the court's decision, and (2) in the individual action, the *Engle* jury's common core findings in Phase I would be given res judicata effect." *Ciccone*, 190 So. 3d at 1037 (internal quotation marks and citations omitted). Based on this decision, persons meeting the *Engle* class member definition could file lawsuits as late as December 21, 2007, for causes of action which accrued between May 5, 1990, and November 21, 1996. *Id.* at 1042

This Court has previously rejected the notion that a surviving spouse of a smoker is an *Engle* class member in his or her individual right. In *Fanali v. R.J. Reynolds Tobacco Co.*, 220 So. 3d 1209, 1210–11 (Fla. 4th DCA 2017), the surviving spouse of a deceased smoker sued a tobacco company under the Florida Wrongful Death Act. Because it was undisputed that the deceased smoker knew he had a smoking related injury before May 5, 1990, the statute of limitations bar date for *Engle* class membership, the tobacco company moved for and was granted summary judgment. *Id.* The surviving spouse appealed, arguing, just as Plaintiff does here, that she met the definition of an *Engle* class member because she was a survivor of a Florida resident who died from a smoking related disease. *Id.* Since the deceased smoker did not die until 1993 and the statute of limitations on a wrongful death claim is two years, the surviving spouse maintained that the statute of limitations on her wrongful death claim did not begin to run, much less expire, before the May 5, 1990 bar date. *Id.*

We rejected the surviving spouse's class membership argument. *Id.* Reasoning that "[t]he determination of membership in the *Engle* class has always focused on the smoker, <u>not on the survivors</u>," we concluded that "[t]he term 'survivors' in the class definition is best interpreted as including survivors of addicted smokers who were *Engle* class members." *Id.* at 1211–12 (emphasis added). This holding establishes that smokers whose claims accrued during the May 5, 1990–November 21, 1996, *Engle* window are the only potential *Engle* class members and that any survivor filing suit via *Engle* must establish the smoker's class membership as to each claim. *Id.* In line with our decision in *Fanali*, we now conclude that Plaintiff, a survivor of a smoker who suffered from a smoking-related

disease, is not an *Engle* class member for purposes of her own individual claims. *Id.* at 1212. Although not binding, it is worth noting that federal courts considering *Engle* cases have reached the same conclusion. *See, e.g., Elkins v. R.J. Reynolds Tobacco Co.*, 65 F. Supp. 3d 1333, 1338 (M.D. Fla. 2014) (affirming that "spouses asserting loss of consortium claims are not *Engle* plaintiffs for purposes of entitlement to *Engle* tolling").

Having determined that Plaintiff is not entitled to the tolling benefit of *Engle* class membership for purposes of claims brought in her individual right, we must next consider whether her loss of consortium claim was a separate and distinct cause of action belonging to Plaintiff individually or merely an additional remedy available for the survival claim Plaintiff brought on Decedent's behalf. If it was nothing more than an additional remedy which could be sought based on the timely pled survival action, then it appears that the claim was not barred by the statute of limitations. *Soffer v. R.J. Reynolds Tobacco Co.*, 187 So. 3d 1219, 1229 (Fla. 2016) (holding that *Engle* class members' requests for punitive damages in conjunction with negligence and strict liability claims were not barred by the statute of limitations because, although such requests were not made in *Engle*, they were not subject to a separate statute of limitations as "a claim for punitive damages is not a separate, free-standing cause of action subject to a separate statute of limitations, but is rather a remedy that can be sought based on any properly pled cause of action"). However, if it was a free-standing cause of action unique to Plaintiff, then it was subject to a separate statute of limitations.

Under the common law, a plaintiff may recover damages for the loss of consortium due to his or her spouse's injury caused by the negligence of another. *Gates v. Foley*, 247 So. 2d 40, 43 (Fla. 1971). Consortium has been defined as:

> [T]he companionship and fellowship of husband and wife and the right of each to the company, cooperation and aid of the other in every conjugal relation. Consortium means much more than mere sexual relation and consists, also, of that affection, solace, comfort, companionship, conjugal life, fellowship, society and assistance so necessary to a successful marriage.

*Id.*

Loss of consortium claims, while derivative causes of action based on the injury of the claimant's spouse, are nevertheless separate and distinct causes of actions belonging solely to the claimant. *See Metro. Dade Cty. v.*

8

*Reyes*, 688 So. 2d 311, 312 (Fla. 1996); *Busby v. Winn & Lovett Miami, Inc.*, 80 So. 2d 675, 676 (Fla. 1955); *Randall v. Walt Disney World Co.*, 140 So. 3d 1118, 1121 (Fla. 5th DCA 2014). Accordingly, as loss of consortium claims are separate causes of action, they must be "timely" in their own right. *See Gates*, 247 So. 2d at 45 ("Where there is a cause of action brought by the injured husband pending, the wife's consortium action, if not time barred, may be joined with her husband's claim . . . ." (emphasis added)). Here, the statute of limitations on Plaintiff's loss of consortium claim began to run in 1992, fifteen years before Plaintiff filed her lawsuit. Plaintiff's loss of consortium claim was well out of range of any statute of limitations recognized in Florida and was, therefore, time barred.

Further, we are not persuaded that Plaintiff's loss of consortium claim was an additional remedy of the survivorship claim by analogy to the Florida Wrongful Death Act. While it is true that the Florida Wrongful Death Act allows for a surviving spouse to "recover for loss of the decedent's companionship and protection and for mental pain and suffering" when a person dies as the result of a personal injury, this remedy is a creature of statute. § 768.21(2), Fla. Stat. (2007); *see also Nissan Motor Co. v. Phlieger*, 508 So. 2d 713, 714 (Fla. 1987) ("Florida's Wrongful Death Act does create a right of action in favor of statutory beneficiaries which was not recognized at common law."). There is simply nothing in the common law automatically allowing for this remedy in a personal injury claim brought by the injured party. Rather, as discussed above, the spouse seeking consortium damages must bring a claim in his or her own right and prove that the injury affected his or her marriage to the injured party. *See Peterson v. Sun State Int'l Trucks, LLC*, 56 So. 3d 840, 842 (Fla. 2d DCA 2011) ("When a jury finds that one spouse has sustained injuries as a result of the negligence of a third party, an award of damages to the other spouse for loss of consortium is not automatic. Instead, in order to prevail on a claim for loss of consortium, the claiming spouse must present competent testimony concerning the impact that the incident has had on the marital relationship.").

We note that although loss of consortium claims are subject to a separate statute of limitations, there is some ambiguity concerning whether an otherwise time barred loss of consortium claim could relate back to the injured spouse's timely filed personal injury claim. The applicable Rule of Civil Procedure governing the relation-back of amendments provides, in pertinent part, that "[w]hen the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment shall relate back to the date of the original pleading." Fla. R. Civ. P. 1.190(c). Until very recently, case law interpreting this rule

9

established that newly added loss of consortium claims do not relate back to a timely pled personal injury action. *W. Volusia Hosp. Auth. v. Jones*, 668 So. 2d 635, 636 (Fla. 5th DCA 1996) (holding that an untimely loss of consortium claim does not relate back to the date of the injured spouse's timely suit); *Daniels v. Weiss*, 385 So. 2d 661, 663 (Fla. 3d DCA 1980) (same). Recently, the Florida Supreme Court disapproved of these cases to the extent that that they stood for the proposition that amended complaints which assert new and distinct causes of action can never relate back to the date of original filing. *Kopel v. Kopel*, 42 Fla. L. Weekly S26, S29 (Fla. Jan. 26, 2017).

Although *Kopel* raises a question as to whether a newly asserted loss of consortium claim is deemed to arise out of the same conduct, transaction, or occurrence as the personal injury claim from which it derives, we do not believe that *Kopel* mandates the conclusion that a spouse's untimely loss of consortium claim relates back to the date of the other spouse's timely filed personal injury suit. Indeed, the *Kopel* court expressly provided that it was not "passing judgment as to the correctness" of the ultimate conclusions reached in *West Volusia Hospital Authority* or *Daniels*, but was instead holding that it is *possible* for a new claim to relate back. *Id.* at S27 n.4.

Further, in addition to holding that the loss of consortium claims did not relate back because they were separate and distinct from the injured spouses' causes of action, the *West Volusia Hospital Authority* and *Daniels* courts also held that the claims did not relate back because they brought a new party to the lawsuit. *W. Volusia Hosp. Auth.*, 668 So. 2d at 636; *Daniels*, 385 So. 2d at 663. *Kopel* did not disturb this conclusion, and neither will we. Generally speaking, the relation-back doctrine does not apply when an amendment seeks to add an entirely new party to the action. *See Roback v. Cassaro*, 837 So. 2d 1061, 1062 (Fla. 4th DCA 2003). However, courts have recognized an exception to this rule where the new party is sufficiently related to an original party to the extent that amendment would not cause any prejudice. *Id.* at 1063; *Russ v. Williams*, 159 So. 3d 408, 410 (Fla. 1st DCA 2015). Married individuals are not deemed "sufficiently related" by virtue of their marriage alone. *Russ*, 159 So. 3d at 411 (affirming that amendment to change defendant in tort suit from husband to wife did not relate back because spouses are "separate individuals" and "each spouse has his or her own legal rights and obligations"). Further, it cannot be said that allowing the untimely addition of an injured party's spouse as a plaintiff does not cause any prejudice as it exposes the defendant to additional lability. To that end, because a loss of consortium claim belongs to a separate plaintiff, it is our view that loss of consortium claims which are otherwise time barred do

not relate back to the date of the injured spouse's otherwise timely filed lawsuit.

In sum, we conclude that Plaintiff's loss of consortium claim was a separate and free-standing claim belonging to her individually and that Plaintiff cannot be considered an *Engle* class member for purposes of her individual claims. Therefore, the filing of *Engle* had no tolling effect on the applicable statute of limitations. Because Plaintiff did not file her lawsuit until fifteen years after the statute of limitations began to run and her claim does not relate back to the timely filed survival claim, Plaintiff's loss of consortium claim was time barred. Accordingly we conclude that the court erred in denying PM's motion for directed verdict on the issue.

## On Cross-Appeal

On cross-appeal, Plaintiff takes issue with the court's instructions on her fraud by concealment and conspiracy counts as well as its decision to instruct the jury on the legal effects of cigarette warning labels. A trial court's decision to give or refuse to give a proposed jury instruction is reviewed for an abuse of discretion. *R.J. Reynolds Tobacco Co. v. Jewett*, 106 So. 3d 465, 467 (Fla. 1st DCA 2013). A trial court abuses its discretion when it gives an instruction that is "'reasonably calculated to confuse or mislead'" the jury, resulting in a miscarriage of justice. *Goldschmidt v. Holman*, 571 So. 2d 422, 425 (Fla. 1990) (quoting *Fla. Power & Light Co. v. McCollum*, 140 So. 2d 569, 569 (Fla. 1962)). Further, "[a] trial court abuses its discretion when it fails to give a proposed instruction that is (1) an accurate statement of the law, (2) supported by the facts of the case, and (3) necessary for the jury to properly resolve the issues, so long as the subject of the proposed instruction is not covered in other instructions given to the jury and the failure to instruct is shown to be prejudicial." *Jewett*, 106 So. 3d at 467.

### a) The Fraud-Based Instructions

Plaintiff argues that the court erred when it instructed the jury on her claims for fraud by concealment and conspiracy because it asked the jury to find whether Decedent detrimentally relied on a "statement that was misleading to Decedent because it concealed or omitted a material fact" instead of asking the jury to find whether Decedent relied on PM's "concealment of material information." Plaintiff maintains that these instructions did not accurately reflect the law because fraudulent concealment may occur by omission. PM counters that an omission by itself cannot serve as the basis for fraudulent concealment absent some sort of special relationship giving rise to a fiduciary duty. Alternatively,

11

PM argues that the instruction given was warranted based on the facts of the case. Plaintiff is correct that reliance on a statement is not a requirement, however, we hold that the instruction as given was nonetheless proper based on the individual facts of the case.

In *R.J. Reynolds Tobacco Co. v. Calloway*, 201 So. 3d 753, 766 (Fla. 4th DCA 2016), this Court considered the propriety of a jury instruction on a smoker's fraudulent concealment claim and held that it did not pass legal muster because it failed to instruct the jury that detrimental reliance was necessary. In doing so, we wrote:

> "[I]n a post-*Engle* case, a plaintiff alleging fraudulent concealment need only prove that he or she detrimentally *relied* upon the defendant tobacco corporation's misinformation." [*Philip Morris USA, Inc. v. Kayton,* 104 So. 3d 1145, 1150 (Fla. 4th DCA 2013}] (emphasis added). "Similarly, a plaintiff claiming conspiracy to commit fraudulent concealment in an *Engle* progeny case need only prove that he or she detrimentally *relied* upon deceptive statements made by a member of the conspiracy." *Id.* (emphasis added). The instruction need not include reliance on "a statement" unless the facts of the case warrant it. What is necessary is that an instruction properly tailored to the facts of the case apprise the jury of the essential element of "reliance" in a fraudulent concealment claim.

*Id.* (emphasis added).

The above language establishes that in an *Engle* case, a fraudulent concealment claim need not be limited to reliance on a "statement," but, at the same time, also establishes that an instruction referencing reliance on "a statement" is not incorrect as a matter of law. *Id.* The Second District Court has since considered this issue and, after a thorough discussion, rejected the notion that an *Engle* fraudulent concealment claim must be limited to reliance on a "statement." *Philip Morris USA, Inc. v. Duignan*, 42 Fla L. Weekly D2427, D2430–32 (Fla. 2d DCA Nov. 15, 2017). Instead, in line with *Calloway*, it concluded that "whether an instruction that a jury must find reliance on a 'statement' is necessary or proper will depend on the nature of the claims presented and the evidence at trial." *Id.* at D2431.

In the instant case, Plaintiff testified as to specific advertising statements which she claimed Decedent detrimentally relied upon in formulating his belief that smoking filtered cigarettes was safe.

12

Accordingly, because there was evidence presented at the trial regarding Decedent's reliance on "statements," the instruction was not improper.

### b) The Warning Label Instruction

Plaintiff also takes issue with the court's decision to provide an instruction on the effect of cigarette warning labels, arguing that the instruction was inapplicable to Plaintiff's suit as she did not bring a failure to warn claim. She further maintains that, especially when combined with PM's counsel's closing argument, the instruction led the jury to believe that PM could not be liable for any fraudulent concealment effectuated through advertising. PM counters that there was no error as the challenged instruction was an accurate statement of law and was necessary to ensure that the jury knew it "could not impose liability based on a legally impermissible theory—that [the tobacco companies] should have placed additional or different warnings on cigarette packages or in advertisements." Although the propriety of a warning label instruction in *Engle* cases appears to be an issue of first impression, based on the case law discussing the preemptive effect (or lack thereof) of cigarette warning labels on *Engle*-type claims, we conclude that the instruction as worded did not serve any purpose other than to confuse the jury and was, therefore, improper.

The language of the instruction at issue was based on the Federal Cigarette Labeling and Advertising Act ("Labeling Act"), which was enacted by Congress "in 1965 in response to the Surgeon General's determination that cigarette smoking is harmful to health." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (footnote omitted). To that end, the Labeling Act "required that every package of cigarettes sold in the United States contain a conspicuous warning, and it pre-empted state-law positive enactments that added to the federally prescribed warning." *Id.* (citing 15 U.S.C. § 1331). "The Labeling Act has since been amended further to require cigarette manufacturers to include four more explicit warnings in their packaging and advertisements on a rotating basis." *Id.* at 78 (footnote omitted).

In *Engle*, the Florida Supreme Court did not expressly address whether the class' state law tort claims were preempted by the Labeling Act. However, addressing the propriety of a closing argument, the court wrote that "[a]lthough compliance with the federal warnings preempted any claim based on failure to warn, it <u>did not</u> eliminate the other causes of action that the jury had to consider in Phase I." *Engle*, 945 So. 2d at 1273 (emphasis added). Despite this dicta, the tobacco companies have continuously argued that *Engle* plaintiffs' claims are pre-empted by the

13

Labeling Act. Recently, the Florida Supreme Court revisited the issue and definitively held that *Engle* plaintiffs' strict liability and negligence claims are <u>not</u> preempted by the Labeling Act. *R.J. Reynolds Tobacco Co. v. Marotta*, 214 So. 3d 590, 605 (Fla. 2017).

In *Marotta*, the court reasoned that "the record in *Engle* reflects that the claims were grounded in allegations that *Engle* defendants deliberately manufactured their products to increase the likelihood of addiction, despite defendants' knowledge of the hazards of nicotine, and that *Engle* plaintiffs suffered disease and death as a result of their inability to quit." *Id.* Based on the foregoing, it concluded that preemption was not a valid defense to the afore-outlined claims because "[f]ederal tobacco regulations have not explicitly allowed the type of conduct underlying *Engle* claims, namely, the intentional manipulation of nicotine levels." *Id.* at 604–05. The *Marotta* court did not address the effect of the Labeling Act on fraudulent concealment and conspiracy to commit fraudulent concealment causes of action, but this is because the issue has already been squarely addressed by the United States Supreme Court.

In *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 527 (1992), the Court considered whether a smoker's state law fraudulent misrepresentation and conspiracy to misrepresent or conceal material facts claims were preempted by the Labeling Act. To the extent that the smoker's fraudulent misrepresentation claim was based on the theory that, "through their advertising, [the tobacco companies] neutralized the effect of federally mandated warning labels," the plurality[3] held that the claims <u>were</u> preempted. *Id.* However, to the extent the claims were predicated on a "state-law duty not to not make false statements of material fact or to conceal such facts," the plurality held that the fraudulent misrepresentation and conspiracy claims <u>were not</u> preempted by the Labeling Act. *Id.* at 528, 530. As such, *Cipollone* established that a smoker's "claim based on allegedly fraudulent statements made in [the tobacco companies'] advertisements is not pre-empted by [the Labeling Act]." *Id.* at 529.

The Court revisited the issue of preemption and fraud based claims against tobacco companies again in *Altria*. 555 U.S. at 76–87. There, a smoker alleged that a tobacco company violated the Maine Unfair Trade Practices Act by fraudulently conveying through its advertising that "light" cigarettes delivered less tar and nicotine than regular brands despite its knowledge to the contrary. *Id.* at 72–73. The tobacco company argued

---

[3] The plurality was comprised of Chief Justice Rehnquist and Justices White, O'Conner, and Stevens.

that the claim was preempted because it was "more analogous to the 'warning neutralization' claim found to be pre-empted in *Cipollone*" as it was based "on statements that 'might create a false impression' rather than statements that are 'inherently false.'" *Id.* at 81-82. The Court outright rejected the tobacco company's claim, clarifying that the "warning neutralization" claim found to be pre-empted by *Cipollone* was really a failure to warn claim mislabeled as a fraudulent misrepresentation claim. *Id.* at 82. It further clarified that "[n]othing in the Labeling Act's text or purpose or in the plurality opinion in *Cipollone* suggests that whether a claim is pre-empted turns in any way on the distinction between misleading and inherently false statements." *Id.* It then concluded that:

> [I]t is clear that our holding in *Cipollone* that the common-law fraud claim was not pre-empted is directly applicable to the statutory claim at issue in this case. As was true of the claim in *Cipollone,* respondents' claim that the deceptive statements "light" and "lowered tar and nicotine" induced them to purchase petitioners' product alleges a breach of the duty not to deceive. To be sure, the presence of the federally mandated warnings may bear on the materiality of petitioners' allegedly fraudulent statements, "but that possibility does not change [respondents'] case from one about the statements into one about the warnings."

*Id.* at 82–83 (citation and footnote omitted).

Based on the foregoing precedent, it is plain that a warning label instruction has no impact on *Engle* based negligence or strict liability claims and, likewise, has no bearing on a smoker's claims that the tobacco companies fraudulently concealed material facts regarding the health effects of their cigarettes (both in their advertising and to regulatory authorities) and conspired to make these concealments. *See Altria,* 555 U.S. at 82–83; *Cipollone,* 504 U.S. at 529–30; *Marotta,* 214 So. 3d at 605. These were the only theories of liability Plaintiff asserted.

Despite the fact that Plaintiff did not assert a warning claim and her remaining claims were not pre-empted by the Labeling Act, PM insists that the instruction was nonetheless necessary to resolve the issues in the case. PM points to the following evidence as necessitating the instruction: 1) during Plaintiff's testimony, the jury asked Plaintiff whether there was adequate information about the risks of smoking "with the Surgeon General Report, warning labels on cigarette packs, and various public service announcements" to which Plaintiff responded that "with all the warnings it—it wasn't enough to overcome all the advertisements about

smoking being safer if you smoked filtered cigarettes," and 2) one of Plaintiff's experts testified that PM concealed that it knew smokers were getting more tar and nicotine from filtered cigarettes. Based on the foregoing, PM maintains that "the jury would have been left with the impression that it could impose liability based on a legally impermissible theory [that] the Defendants should have placed additional or different warnings on cigarette packages or in advertising."

PM's argument is flawed in the same way that the tobacco company's argument in *Altria* was flawed. 555 U.S. at 82–83. Plaintiff's evidence establishing that the fraudulent concealments and misrepresentations contained in advertising induced Decedent to purchase cigarettes despite the warnings had nothing to do with the adequacy of the warnings, but rather, as explained by the *Altria* court, went to the materiality of the fraud. *Id.* Accordingly, despite PM's best attempts to argue otherwise, nothing about this evidence somehow changed the case from one about the fraudulent statements to one about the warnings.

At any rate, to the extent the instruction had any bearing on the facts of the case, the possibility that it confused the jury is exceedingly high, especially considering the fact that the jury found for PM on Plaintiff's intentional tort claims. The instruction stated that based on the cigarette warning labels, "cigarette advertising after July 1, 1969 cannot be the subject of <u>any claim</u> that the advertising undermined or neutralized the warnings or made them less effective." As Plaintiff compellingly argues, "most reasonable jurors (and even most lawyers) would misunderstand this language to mean that tobacco companies can have no liability for any statements in their advertising that are contrary to the mandated health warnings." Indeed, this is exactly how PM's counsel explained the instruction in its closing argument. As discussed above, this is absolutely not true—PM could still be liable for fraudulent statements contained in its advertising despite the presence of a contrary warning label.

Our holding should not be interpreted as absolutely foreclosing the use of a warning label instruction in an *Engle* case. As indicated in *Altria*, the presence of warning labels on cigarette packs may go to the materiality of the tobacco companies' misrepresentations, or, put otherwise, to the issue of the smoker's detrimental reliance on the statements. *Id.* at 83. The instruction provided by the court here, however, simply did not explain these subtle, but critical, nuances.

In sum, we conclude that the warning label instruction was improperly given in this case. Accordingly, we are compelled to reverse and remand for a new trial. As outlined in the direct appeal analysis section, on

remand, the court should enter judgment in favor of PM on Plaintiff's individual loss of consortium claim.

*Reversed and remanded with instructions.*

CONNER and FORST, JJ., concur.

*     *     *

**_Not final until disposition of timely filed motion for rehearing._**