# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2023-3371

_____

BAM TRADING SERVICES, INC.,
d/b/a Binance.US,

    Petitioner,

    v.

STATE OF FLORIDA, OFFICE OF
FINANCIAL REGULATION,

    Respondent.

_____

On appeal from the Office of Financial Regulation.
Russell C. Weigel, III, Commissioner.

October 17, 2024

EN BANC

B.L. THOMAS, J.

Having previously granted Respondent's motion for rehearing en banc, we substitute the following opinion for the panel opinion previously issued.

Petitioner seeks review of an Emergency Suspension Order (ESO) on the grounds that it is facially deficient under section 120.60(6), Florida Statutes, and should therefore be quashed. We agree.

*Facts*

Petitioner is a Florida-based digital assets company doing business as Binance.US, under a money-services business license supervised by the Office of Financial Regulation (OFR). Binance Holdings Limited (Binance Holdings) is an affiliate company of Petitioner doing business as Binance.com. Changpeng Zhao (Zhao) is the former CEO of Binance Holdings. Zhao has held an indirect ownership stake in Petitioner since 2019 and was Petitioner's Chairman of the Board of Directors.

In November 2023, Zhao and Binance Holdings entered federal plea agreements for not implementing Anti-Money Laundering (AML) and Bank Secrecy Act compliance programs. Later, Zhao stepped down as Petitioner's Chairman of the Board of Directors and relinquished his voting rights in Petitioner through a proxy arrangement.

On November 29, 2023, following the plea deals involving Zhao and Binance Holdings, OFR issued the emergency suspension order (ESO) on review. The order suspended Petitioner's money-services business license and directed Petitioner to cease and desist from engaging in money transmission activity. It asserted that under section 560.114(2)(c), Florida Statutes, an immediate serious danger to the public health, safety, and welfare exists whenever "a natural person who is required to be listed on a licensee's application for a money services business license pursuant to section 560.141(1)(a)3., is criminally charged with, or arrested for, among other things, a crime described in section[] 560.114(1)(o), Florida Statutes."

The order made factual findings that Zhao was Petitioner's "Controlling Shareholder," an indirect owner, and a control person of Petitioner "whose name must be listed on its license application," as well as CEO of Binance Holdings. It found that Zhao was criminally charged with violating the Bank Secrecy Act by willfully causing Binance Holdings to fail to maintain and implement an effective AML program in violation of 31 U.S.C. §§ 5318(h) and 5322(b), (c), and (e) and 31 C.F.R. § 1022.210 during the timeframe between August 2017 and October 2022. Zhao admitted in his plea agreement that as founder and CEO he willfully evaded the requirements in the Bank Secrecy Act

2

regarding registration and the AML, prioritizing growth and profits over compliance with U.S. law. He advised staff that it was "better to ask for forgiveness than permission" in what he described as a "grey zone," and he believed that compliance would have interfered with gaining market share and increasing profits. The order also found that Zhao had been charged under federal law with a crime involving fraud, moral turpitude, or dishonest dealing, falling within the category of offense described in section 560.114(1)(o), Florida Statutes.

The order then includes a conclusion of law that Zhao's conduct constituted grounds for suspending Petitioner's license under section 560.114(1)(o). The order also concluded that because the conduct occurred on an ongoing basis during the licensed operation of Petitioner, the continued operation of Petitioner constituted an immediate danger to the public health, safety, and welfare necessitating an emergency suspension.

### *Jurisdiction*

The Court has "the power of direct review of administrative action, as prescribed by general law." Art. V, § 4(b)(2), Fla. Const. By general law, the Legislature has authorized this court to review "a preliminary, procedural, or intermediate order of [an] agency if review of the final agency decision would not provide an adequate remedy." § 120.68(1)(b), Fla. Stat. (2023). Review of agency orders suspending a license purported under the authority of section 120.60(6), Florida Statutes, is by "petition for review." *See* Fla. R. App. P. 9.190(b)(2); 9.100(c)(3). Further, section 120.60(6)(c), Florida Statutes states that "[t]he agency's findings of immediate danger, necessity, and procedural fairness are judicially reviewable."

### *Standard of Review*

We respectfully decline to apply the "scope of review" of non-final agency action as defined in *State v. Murciano*, 163 So. 3d 662, 664–65 (Fla. 1st DCA 2015), because that definition is not grounded in or authorized by section 120.68(7), Florida Statutes, which specifically defines our authority in such cases:

The court shall remand a case to the agency for further proceedings consistent with the court's decision *or set aside agency action*, as appropriate, when it finds that:

. . . .

(c)  The *fairness* of the proceedings or the correctness of the action may have been impaired *by a material error in procedure* or a failure to follow prescribed procedure;

(d)  The agency has *erroneously interpreted a provision of law* and a correct interpretation compels a particular action[.]

§ 120.68(7), Fla. Stat. (emphasis added).

We note that in *Murciano,* this Court stated that the "scope of review" of non-final agency action was "'no broader than the right of review by common law certiorari.'" 163 So. 3d at 664 (quoting *CNL Resort Hotel, L.P. v. City of Doral,* 991 So. 2d 417, 420 (3d DCA 2008) (quoting *Fla. Dept. of Financial Servs. v. Fugett,* 946 So. 2d 80, 81 (Fla. 1st DCA 2006)). Respectfully, this is an incorrect statement of the nature of our review, the statement originating in a prior decision of this Court in *Charlotte County v. General Development Utilities, Inc.,* 653 So. 2d 1081 (Fla. 1st DCA 1995). In that decision, this Court relied on the following proposition from a committee note:

Our review of the PSC order here at issue is pursuant to section 120.68(1), Florida Statutes, which provides in part:

(1) A party who is adversely affected by final agency action is entitled to judicial review . . . . A preliminary, procedural, or intermediate agency action or ruling, including any order of a hearing officer, is immediately reviewable if review of the final agency decision would not provide an adequate remedy.

The Committee Notes to Florida Rule of Appellate Procedure 9.100(c),[2] *explain* that the statutory authority

4

to review non-final administrative action is analogous to and no broader than the right of review by common law writ of certiorari.

653 So. 2d at 1084 (emphasis added).

The decision in *Charlotte County* further stated in footnote two that:

> The Committee Notes to rule 9.100(c) state:
>
> > It was the opinion of the Advisory Committee that such a right of review is guaranteed by the statute and is not dependent on a court rule, since Article V, Section 4(b)(2) of the Florida Constitution provides for legislative grants of jurisdiction to the district courts to review administrative action without regard to the finality of that action. *The Advisory Committee was also of the view that the right of review guaranteed by the statute is no broader than the generally available common law writ of certiorari, although the statutory remedy would prevent resort to an extraordinary writ.*

653 So. 2d at 1084 n.2 (emphasis added).

This committee note cannot be authority to narrow this Court's standard of review granted by the organic and general law, as that committee note itself seemed to recognize. We cannot and will not rely on this incorrect proposition to deprive a party of their statutory right to "immediate" judicial review of "a preliminary, procedural, or intermediate order of [an] agency" . . . if [final] review of the final agency decision would not provide an adequate remedy." § 120.68(1)(b) Fla. Stat. (2023).

We note that, despite the broad statements about the scope of review under section 120.68(1) in *Murciano*, *Fugett,* and *Charlotte County*, in the context of ESO's under section 120.60(6), this Court has not employed a limited certiorari scope of review. Rather, in a long line of cases, we have cited section 120.68(1) as our authority to review the non-final orders at issue and then proceeded to assess

5

whether the ESO's on their face satisfied the requirements of section 120.60(6). *See, e.g.*, *Renner v. Dep't of Health*, 355 So. 3d 552 (Fla. 1st DCA 2023) (holding that ESO was not as narrowly tailored as possible under the circumstances); *Webber v. State, Dep't of Bus. and Prof. Reg*, 198 So. 3d 922 (Fla. 1st DCA 2016) (citing section 120.68(1)(b), Fla. Stat. and Fla. R. App. P. 9100(a) and holding that the ESO did not establish the elements required under 120.60(6) because it "fail[ed] to demonstrate on its face an immediate and recurring threat to the public and the license suspension is not a narrowly tailored remedy"); *Mendelsohn v. State, Dep't of Health*, 68 So. 3d 965 (Fla. 1st DCA 2011) (citing section 120.68(1), Fla. Stat. and holding that ESO failed to provide "specific reasons why the suspension is necessary to prevent immediate harm to the public").

Furthermore, neither the constitution nor the Legislature equated our review to the demanding standard applicable to common law certiorari review as noted above. In addition, in section 120.60(6), the Legislature provided that such orders are subject to "judicial review" as we discuss in more detail below. Where the organic law authorizes the Legislature to define our jurisdiction and review of non-final agency action, respectfully, we are not at liberty to disregard those binding definitions based on prior erroneous judicial decisions inconsistent with applicable organic and general law. We therefore overrule the erroneous holdings in *Murciano*, *Fugett, Charlotte County*, and any other decision where we held that our scope of review under section 120.68(7) "is analogous to and no broader than the right of review by common law certiorari." *Charlotte County,* 653 So. 2d at 1084.

*Analysis*

The ESO contains a material error in procedure and an erroneous interpretation of sections 560.114(2) and 120.60(6), Florida Statutes.

Section 560.114(2) states:

> Pursuant to s. 120.60(6), the office *may* summarily suspend the license of a money services business if the office finds that a licensee poses an immediate, serious danger to the public health, safety, and welfare. A

6

proceeding in which the office seeks the issuance of a final order for the summary suspension of a licensee shall be conducted by the commissioner of the office, or his or her designee, who shall issue such order. The following acts are deemed to constitute an immediate and serious danger to the public health, safety, and welfare, and the office may immediately suspend the license of a money services business if:

. . . .

c) A natural person required to be listed on the license application for a money services business pursuant to s. 560.141(1)(a)3. is criminally charged with, or arrested for, a crime described in paragraph (1)(o), paragraph (1)(p), or paragraph(1)(q).

Section 560.114(1) states:

The following actions by a money services business, authorized vendor, or affiliated party constitute grounds for the issuance of a cease and desist order; the issuance of a removal order; the denial, suspension, or revocation of a license; or taking any other action within the authority of the office pursuant to this chapter:

. . . .

(o) Having been convicted of, or entered a plea of guilty or nolo contendere to, any felony or crime punishable by imprisonment of 1 year or more under the law of any state or the United States which involves fraud, moral turpitude, or dishonest dealing, regardless of adjudication.

Section 120.60(6) states:

If the agency finds that immediate serious danger to the public health, safety, or welfare requires emergency suspension, restriction, or limitation of a license, the agency *may* take such action by any procedure that is *fair under the circumstances* if:

. . . .

    (c)    The agency states in *writing* at the time of, or prior to, its action the specific facts and reasons for finding an immediate danger to the public health, safety, or welfare and *its reasons for concluding that the procedure used is fair under the circumstances*. The agency's findings of immediate danger, necessity, and procedural fairness are judicially reviewable. Summary suspension, restriction, or limitation may be ordered, but a suspension or revocation proceeding pursuant to ss. 120.569 and 120.57 shall also be promptly instituted and acted upon.

(Emphasis added).

Here, the ESO did not state the specific reasons for concluding that the procedures it used were fair under the circumstances. Rather, it relied on section 560.114(2) as authorizing OFR to suspend the license. However, the statute itself says the agency needs to provide reasons and only that the agency *may* suspend the license. *See* § 120.60(6), Fla. Stat. The usage of "may" in the statute implies discretion, rather than obligation. Additional reasoning beyond mere reference to the statute is necessary to suspend the license, given the property interest at stake here and potential harm discussed below.

The ESO further fails to discuss alternative remedies or why less-harsh remedies would be insufficient to address the purported emergency. It offers no explanation why a less-drastic measure to license suspension and complete termination of Petitioner's business in Florida are insufficient to stop the alleged harm. Indeed, the ESO fails to address, or even acknowledge, that the potential harm here from the ESO is significant. Suspending Petitioner's license threatens significant financial losses to more than 170,000 accounts in Florida. Unlike most traditional money transmitters, Petitioner holds significant digital assets on behalf of its Florida customers. For Petitioner to immediately comply with the ESO, it would be necessary to liquidate the digital asset holdings of every customer. A forced and untimely sale of Florida customers' digital assets threatens financial harm because of digital asset price fluctuations. In addition, an account holder who

8

is forced to sell a digital asset at a price higher than a cost basis would incur unplanned and extensive tax liabilities. To comply with the requirements of section 120.60(6)(c) highlighted above, OFR needed to state why the drastic and disruptive measure of an ESO was "fair under the circumstances." It did not do so, and we must set the ESO aside. *See* § 120.68(7)(c), Fla. Stat.

SET ASIDE.

OSTERHAUS, C.J., and LEWIS, ROBERTS, ROWE, RAY, BILBREY, WINOKUR, M.K. THOMAS, NORDBY, TANENBAUM, and LONG, JJ., concur.

ROWE, J., concurs with an opinion.

BILBREY, J., concurs with an opinion in which LEWIS, ROBERTS, KELSEY, and M.K. THOMAS, JJ., join.

KELSEY, J., concurs in result.

TANENBAUM, J., concurs with an opinion in which B.L. THOMAS and WINOKUR, JJ., join.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

ROWE, J., concurring.

I fully concur in the majority opinion. I write only to point out that nothing in the en banc opinion addresses the reasons the court ordered en banc review. Some judges may have voted to order en banc rehearing on the ground that rehearing was "necessary to maintain uniformity in the court's decisions." *See* Fla. R. App. P. 9.331(d)(1). Some judges may have voted to order en banc rehearing on the ground that "the case or issue is of exceptional importance." *Id*. And still other judges may have voted against

9

ordering en banc rehearing. *See* Fla. R. App. P. 9.331(a) (providing that en banc proceedings may occur upon order by "[a] majority of the participating judges of a district court of appeal.").

In my view, en banc rehearing of the panel decision was not necessary to maintain uniformity in the court's decisions. As explained on pages five and six of the en banc opinion, in reviewing nonfinal agency action, this court has not always applied the limited certiorari scope of review discussed in *State v. Murciano*, 163 So. 3d 662, 664–65 (Fla. 1st DCA 2015)—at least not in the context of the court's decisions addressing emergency suspension orders under section 120.60(6), Florida Statutes. The panel opinion did not announce a rule of law which conflicts with the court's decisions addressing emergency suspension orders. Rather, the panel opinion was entirely consistent with that line of authority. For this reason—in my view—there was no need to order en banc rehearing to maintain decisional uniformity. *See Chase Fed. Sav. & Loan Ass'n v. Schreiber*, 479 So. 2d 90, 94 (Fla. 1985) ("We expressly granted the district courts broad discretionary authority 'to develop their own concept of decisional uniformity. . .'") (quoting *In re Florida Rules of Appellate Procedure*, 374 So. 2d 992, 994 (Fla. 1979)).

BILBREY, J., concurring.

I fully concur in the majority opinion and in the decision to rehear the case en banc to unambiguously recede from erroneous precedent. The en banc majority opinion and Judge Rowe in her concurring opinion are correct that we have not consistently followed our statement in *Murciano I* that our "scope of review" of nonfinal agency action is "no broader than the right of review by common law certiorari." *State v. Murciano*, 163 So. 3d 662, 664 (Fla. 1st DCA 2015) (citations omitted). But we have cited *Murciano I* for this proposition as recently as this year. *See Agency for Health Care Admin. v. Murciano*, 381 So. 3d 1283, 1286 (Fla. 1st DCA 2024). We are correct to consider the issue en banc so we can make a clean break from our holding in both *Murciano* cases, as well as others, and leave interested parties with no doubt as to our scope of review when considering a challenge to nonfinal agency action. Otherwise, the "'older is better' versus 'later is

10

greater'" debate again ensues over which line of cases is binding. *See* K. K. Berman, A. Richardson & R. Scavone, *A Not-So-Little Problem with Precedent: Intra-District Conflict in Florida District Courts of Appeal*, 97 Fla. Bar J. 14, 14 (Jan./Feb. 2023).

"[A] three-judge panel of a district court should not overrule or recede from a prior panel's ruling on an identical point of the law." *See In re Rule 9.331, Determination of Causes by a District Court of Appeal En Banc, Florida Rules of Appellate Procedure*, 416 So. 2d 1127, 1128 (Fla. 1982). In considering this case en banc, we are correctly adhering to the firmly established prior panel precedent doctrine. *See Taylor Eng'g, Inc. v. Dickerson Fla., Inc.*, 221 So. 3d 719, 723 n.3 (Fla. 1st DCA 2017) (calling the doctrine "well-established").

When faced with erroneous precedent, barring a decision from a higher court or a legislative change, we are required to consider the matter en banc before we can recede from it. *See Wanless v. State,* 271 So. 3d 1219, 1223 (Fla. 1st DCA 2019) ("We are of course bound to follow our own decisions unless and until an intervening decision from the Florida Supreme Court, the United States Supreme Court, or this court sitting en banc compels otherwise."); *see also Sims v. State*, 260 So. 3d 509, 514 (Fla. 1st DCA 2018); *Adams v. State*, 188 So. 3d 849, 851 (Fla. 1st DCA 2012).[*] Failing

---

[*] Except the relatively new Sixth District, which has apparently not addressed the issue, the prior panel precedent doctrine is followed by all Florida district courts. *See, e.g.*, *State v. Crose*, 378 So. 3d 1217, 1243–44 (Fla. 2d DCA 2024) (en banc); *State v. Washington*, 114 So. 3d 182, 188–89 (Fla. 3d DCA 2012); *Fox v. Fox*, 262 So. 3d 789, 792 (Fla. 4th DCA 2018) (en banc); *Williams v. Salt Springs Resort Ass'n*, 298 So. 3d 1255, 1256 (Fla. 5th DCA 2020) (en banc). This aligns with how the United States Eleventh Circuit Court of Appeals treats prior panel precedent. *See United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2023); *see also Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018) (requiring the prior panel precedent "rule" be applied even when the subsequent panel is convinced that the earlier panel was wrong). Unlike Judge Tanenbaum, I do not think I am, or the judges on this court, our sister district courts, or federal circuit judges are violating our oaths of office when we follow prior panel

to adhere to prior panel precedent without en banc consideration opens the possibility for chaos and uncertainty to reign. *See In re Rule 9.331*, 416 So. 2d at 1128 ("[I]f intra-district conflict is not resolved within the district courts by en banc decision, totally inconsistent decisions could be left standing and litigants left in doubt as to the state of law"); *see also Rogers v. State*, 296 So. 3d 500, 519 n.1 (Fla. 1st DCA 2020) (Bilbrey, J., concurring). I appreciate my colleagues' willingness to consider this matter en banc to provide certainty to the bench, bar, and litigants that the majority of the court has not abandoned the prior panel precedent doctrine.

TANENBAUM, J., concurring.

The only meaning to be read into the court's decision to consider this case sitting en banc is its clear approval of the holding originally set out by the panel majority: abrogation of any previous suggestion by this court that the scope of review under section 120.68(1)(b), Florida Statutes, "is analogous to and no broader than the right of review by common law certiorari." The now-en-banc opinion—nearly identical to the panel opinion that preceded it (and having the same author, by the way)—says nothing about a renewed adherence to—or decision not to abandon—any so-called "doctrine" pertaining to prior panel decisions.

I previously have written extensively about how "the idea that three independent judicial officers constituting one of this court's panels are legally 'bound' by a decision of a prior panel of equivalent judicial officers comes from . . . *nowhere*," certainly "nowhere in the law"; or how the so-called "prior panel precedent" (or "horizontal precedent") rule or "doctrine" remains "a fallacy, a figment, a chimera," having "no basis in our state constitution or in any statute." *Normandy Ins. Co. v. Bouayad*, 372 So. 3d 671, 694–99 (Fla. 1st DCA 2023) (Tanenbaum, J., concurring). I continue to pose this challenge to the so-called "doctrine's"

---

precedent despite disagreeing with the prior panel's holding. Instead, for Florida district court judges we are complying with guidance of the Florida Supreme Court as stated in *In re Rule 9.331*.

adherents: Provide one—just one—citation to a constitutional or statutory provision that *requires* a judge to vote against his or her oath[1] of office and blithely hew to a decision of another panel that is clearly contrary to what the substantive law is.[2] Nothing has been forthcoming. Instead, the only response seems to be hackneyed citations to a few prior panels' opinions that have similarly just pronounced the rule (without citation to a source of law)[3] and one 1982 *rule* opinion (read: not a decision or judicial disposition) of the supreme court that actually *rejected* a proposal to adopt as a court rule the very "doctrine" many district court judges still profess to accept and follow. *Cf. id.* at 695 (Tanenbaum, J., concurring) (explaining why *In re Rule 9.331*—an administrative decision of the supreme court, almost exclusively cited by proponents as authority for the "doctrine," rejecting the very rule we are discussing—both does not count as a source of law for the "doctrine" and has been contradicted by real supreme court dispositions since then).

Call it a "rule" or a "doctrine," but reflexively strict adherence to a prior panel's legal conclusion or holding—regardless of its reliance on deeply flawed logic, its distortion of the legal text, or the abject lack of analysis to support it—at best reflects an

---

[1] The oath of which I speak is as follows: "I do solemnly swear (or affirm) that I will support, protect, and defend the Constitution and Government of the United States and of the State of Florida; that I am duly qualified to hold office under the Constitution of the state; and that I will well and faithfully perform the duties of [district appellate judge] on which I am now about to enter. So help me God." Art. II, § 5(b), Fla. Const.

[2] Otherwise, the epistemological razor stated by author Christopher Hitchens applies: "What can be asserted without evidence can also be dismissed without evidence."

[3] Proponents of the "doctrine" engage in something close to question-begging (or, perhaps, circular reasoning) by citing prior *panel* decisions to definitively support their view that they, as members of a subsequent panel, are "*required*" to follow a holding—erroneous as it may be—of an earlier panel unless, with a couple exceptions, the matter is considered by the court en banc.

individual judge's "article of faith" within a broader judicial philosophy, a pronouncement of that judge's approach to judging. A judge of course is free to announce "adherence" to this deciding of cases in a hands-tied manner (unless the judge can find a way to distinguish a disliked holding based on a factual difference). Just the same, a judge could divulge a preference for relying on legislative staff analyses, floor speeches, and empirical data—or, horror of horrors, on an online dictionary rather than a contemporaneous physical one, or exclusively on whatever Bryan A. Garner says—to answer difficult statutory interpretation questions. Simply put, each judge approaches the job with his or her own set of judicial values and mode of thinking, while remaining faithful to the law as he or she sees it, and honoring ethical expectations set for us all.

Under these considerations, there is no authority for this court's en-banc procedure to serve as a vehicle for some members to impose their judicial philosophy on other members who do not buy into it. Some judges, including me, take the view—as a matter of judicial philosophy—that another panel of the same appellate court does not hold the status of our supreme court and lacks writ or other enforcement powers to compel violations of their oath (as they understand it) to follow and faithfully apply the text of the constitution and statutes. *Cf. Gamble v. United States*, 587 U.S. 678, 714–18 (2019) (Thomas, J., concurring) (quotation and citation omitted) (discussing the common-law origins of *stare decisis* principles; how "the founding generation understood that an important function of the Judiciary in a common-law system was to ascertain what reason or custom required, that it was possible for courts to err in doing so, and that it was the Judiciary's responsibility to examine without fear, and revise without reluctance, any hasty and crude decisions rather than leaving the character of [the] law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error"; how "courts today look to different sources of law when exercising the judicial power than did the common-law courts of England"; how "[u]nderlying this legal system is the key premise that words, including written laws, are capable of objective, ascertainable meaning"; how "[a] demonstrably incorrect judicial decision, by contrast, is tantamount to *making* law, and adhering to it both disregards the supremacy of the Constitution and perpetuates a usurpation of the

14

legislative power"; and how the "Constitution does not mandate that judicial officers swear to uphold judicial precedents"; so: "When faced with a demonstrably erroneous precedent, my rule is simple: We should not follow it."). Saying, then, that the public can derive some "certainty" from the present en banc decision that the so-called "doctrine remains operative at the court" is not a logically valid conclusion. Respectfully, this en-banc decision provides no such certainty, as it is entirely silent on the reasoning behind the court-ordered en-banc consideration.

There are a variety of reasons that might motivate a judge to vote to order en-banc rehearing. As for me, very little difference exists between the original panel opinion that I signed onto and the now-en-banc opinion that most of us are signing onto—so why would I not vote for the en-banc version? That does not equate to my validation of a "doctrine" I repeatedly—publicly—have renounced. I agree that a super-majority of the judges on this court "going on the board" as to their agreement with the panel majority's holding here *helps* give assurance that "we really mean it": that it is not statutorily correct to say that direct review of non-final agency action under section 120.68(1)(b) is no broader than certiorari review. But ordering en-banc consideration was not necessary to validate this negation of an incorrect statement of the law. This renunciation would have been every bit as valid (and logically and legally sound) if it had remained as just the decision of our panel. On this front, despite an unsupported suggestion in an article in the *Florida Bar Journal*, there is no controversy—no question, even—regarding which of two conflicting panel holdings is controlling from the perspective of trial courts. The supreme court has addressed this more than once, each time treating the *subsequent* (read: later) panel holding as the prevailing "decisional law" within the district court's jurisdiction. *See Little v. State*, 206 So. 2d 9, 10 (Fla. 1968) ("If the two [panel] decisions conflicted, the only result would be that the instant decision, being later in point of time, would *overrule Allison* as the decisional law in the First District." (emphasis supplied)); *State v. Walker*, 593 So. 2d 1049, 1050 (Fla. 1992) (citing *Little* and dispensing with jurisdiction as being improvidently granted after a subsequent panel of the First District Court of Appeal reached a decision that effectively overruled a prior panel decision, thereby obviating a "direct and express conflict" that had existed between the prior panel and the

Fourth District Court of Appeal); *R.J. Reynolds Tobacco Co. v. Marotta*, 214 So. 3d 590, 604 (Fla. 2017) ("Alternatively, to the extent that these [panel] cases do conflict, the difference could be attributed to a change in the Fourth District's position regarding implied conflict preemption in tobacco product liability cases." (citing *Little* for the proposition quoted above)).

And the supreme court's position on this makes sense. Each panel has the authority to exercise judicial power in the name of the court. *See* Art. V, §§ 1, 4(a) (vesting judicial power in "district courts of appeal" but providing that "[t]hree judges shall consider each case and the concurrence of two shall be necessary to a decision"); *cf.* Art. V, § 4(a), (b), Fla. Const. (1885) (as revised 1940) (providing that the supreme court "may exercise its powers and jurisdiction in divisions," and, with some exceptions, "the judgment of a division concurred in by the Chief Justice shall be the judgment of the Court"). Every opinion goes on pre-release for some duration that allows every judge on our court an opportunity to review it and ask the court to countermand a panel decision to recede from or overrule a prior panel's decision. In fact, our internal operating procedures provide for the following:

> If a majority of a panel votes to join in an opinion (as defined in IOP 5.4.1) containing analysis necessary to the disposition on a point of law that directly conflicts with analysis on the same point of law contained in a final opinion of a prior panel of this court or of this court sitting en banc, the primary judge or the senior judge of the panel shall request an en banc vote of the court pursuant to IOP 6.5.

First Dist. Ct. of Appeal I.O.P. 6.3 (Dec. 2023). Even if the court had not ordered en banc rehearing in this case, rest assured, if a majority of our court disagreed with the panel's disposition, the panel's opinion never would have seen the light of day. A panel-majority's opinion, once released, carries with it the full imprimatur of our court. *See Little*, 206 So. 2d at 10; *Marotta*, 214 So. 3d at 604. That the en-banc court is adopting the panel-majority opinion in this instance can be seen simply as an exercise of good government: bolstering the public's confidence that—the issue having been carefully considered—we all agree, as Judge

16

Bilbrey characterizes it, with making "a clean break" from a prior pronouncement of this court; stating clearly and with nearly one voice that a certiorari standard for review of non-final agency action was wrong—just as the panel in this case had said.

Let me close by addressing the "sky is falling" wails in OFR's motion for rehearing. The failure to adhere to this rule, or "doctrine," does not equate to legal chaos, does not presage the dawn of uncertainty's reign. This fear at best is speculative—albeit mentioned often—lacking any evidence to support it. Each of us takes our responsibilities as an appellate judge seriously. We are quite aware of our place in the state judicial constellation—as the court of last resort in almost all cases coming from the trial courts of our district. None of us would consider putting aside a prior panel decision of this court willy-nilly. So the overwrought statements about the dangers of legal "uncertainty" are unfounded. *Cf. Gamble*, 587 U.S. at 723–25 (Thomas, J., concurring) (speaking to the concerns of "uncertainty" and "instability" that might flow from overturning precedent, noting that "[t]he true irony of our modern *stare decisis* doctrine lies in the fact that proponents of *stare decisis* tend to invoke it most fervently when the precedent at issue is least defensible," also stating that "we would eliminate a significant amount of uncertainty and provide the very stability sought if we replaced our malleable balancing test with a clear, principled rule grounded in the meaning of the text"). I would go so far as to note there are sufficient guardrails in place: the main purpose of having an en-banc procedure being to allow the court as a whole resolve persistently conflicting or frequently vacillating holdings among different panels of the court.

OFR and the public can take heart that the "doctrine of stare decisis" prevails here, just as it does at the supreme court, which is to say it "bends where there has been a significant change in circumstances since the adoption of the legal rule, or where there has been an error in legal analysis." *Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002) (internal citation omitted). As the supreme court more recently explained:

> We believe that the proper approach to *stare decisis* is much more straightforward. In a case where we are

17

bound by a *higher legal authority—whether it be a constitutional provision, a statute, or a decision of the Supreme Court*—our job is to apply that law correctly to the case before us. When we are convinced that a precedent clearly conflicts with the law we are sworn to uphold, *precedent normally must yield*.

We say normally because *stare decisis* means sticking to some wrong decisions. Indeed, *stare decisis* has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up. But once we have chosen to reassess a precedent and have come to the conclusion that it is clearly erroneous, the proper question becomes whether there is a valid reason *why not* to recede from that precedent.

The critical consideration ordinarily will be reliance. It is generally accepted that reliance interests are at their acme in cases involving property and contract rights. And reliance interests are lowest in cases—like this one—involving procedural and evidentiary rules.

*State v. Poole*, 297 So. 3d 487, 506–07 (Fla. 2020), *as clarified on denial of reh'g* (Apr. 2, 2023) (all but last emphasis supplied; internal quotations and citations omitted).

Words to judge by indeed, and so they were in this case.

———————————————

M. Drew Parker, Radey Law Firm, Tallahassee, for Petitioner.

William H. Stafford III and Emily J. Witthoeft, Department of Legal Affairs, Tallahassee; and Brandon M. Greenberg and Melinda H. Butler, Office of Financial Regulation, Tallahassee, for Respondent.

18